569 So.2d 570 (1990)
STATE of Louisiana
v.
Sean YOUNG.
No. KA 89 1558.
Court of Appeal of Louisiana, First Circuit.
October 16, 1990.
*571 Bryan Bush, Dist. Atty., Office of the Dist. Atty. by Tom Walsh, Asst. Dist. Atty., Baton Rouge, for plaintiff/appellee.
Office of the Public Defender, Baton Rouge, for defendant/appellant.
Before LOTTINGER, CARTER and DOHERTY, JJ.[*]
LOTTINGER, Judge.
Defendant was charged in a single grand jury indictment with two counts of first degree murder. La. R.S. 14:30. Count I charged the first degree murder of Terry Pleasant, and Count II charged the first degree murder of Ben Beshears, Jr. Defendant entered pleas of not guilty to the charges and was tried by a jury, which convicted him of both charges. For each of these convictions the trial court imposed a sentence (upon recommendation of the jury) of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant has appealed, urging thirteen assignments of error. In his brief, defendant expressly abandoned assignments of error two, three, four, five, six and nine. The remaining specifications of error are:
1. The trial court erred by denying defendant's motion to close pretrial hearings from public consideration.
7. The trial court erred by denying defendant's motion to quash based on the selection of grand jury forepersons.
8. The trial court erred by overruling defendant's Batson objection.
*572 10. The trial court erred by denying defendant's motion for mistrial.
11. The trial court erred by denying defendant's challenge for cause.
12. The trial court erred by denying defendant's challenge for cause.
13. The trial court erred by denying defendant's motion for mistrial.

FACTS
The victims' dead bodies were discovered during the late evening hours of October 30, 1987, at a residence on Douglas Street in East Baton Rouge Parish. Terry Pleasant's body was found on a sofa bed in the living room; and the body of Ben Beshears, Jr., was on the floor in one of the bedrooms. Beshears' hands were bound behind his back, and his legs were also tied up. There were signs that Beshears had been struck about the head with an object. A bloody, broken telephone receiver was discovered near Beshears' body, together with pieces of the telephone, leading investigating law enforcement officers to believe Beshears had been struck with the telephone.
An autopsy performed on each of the victims on the day after the bodies were discovered revealed that the immediate cause of death of each victim was a single gunshot wound to the head. Dr. Alfredo Suarez, who performed the autopsies for the East Baton Rouge Parish Coroner's Office, testified that the gunshot wound sustained by each victim was a contact wound. Dr. Suarez's testimony indicated that, by characterizing the wounds as contact wounds, he meant the murder weapon had been discharged with the barrel placed against the skin surface of the victim.
During the police investigation which followed the discovery of the victims' bodies, an important breakthrough occurred when the fingerprints of Eugene Williams, a co-perpetrator, were identified as matching latent fingerprints lifted from objects at the crime scene. A search for Williams began. He was found and arrested by the police. Thereafter, Karl Price, another co-perpetrator, was arrested; and then defendant was arrested. After his arrest and after being advised several times of his Miranda rights, defendant made an initial oral statement to the police which was followed by an audiotaped statement and then a videotaped statement as to his participation in the instant offenses.[1]

ASSIGNMENT OF ERROR NO. 1
In this assignment, defendant asserts that the district court erred by denying defendant's pretrial motion to close pretrial hearings from public consideration.
The defendant's motion recited as support for the requested closure of pretrial hearings from the public that defendant had been indicted for two counts of first degree murder and that defense counsel had learned that at least one of the victims had tested positive for AIDS. Additionally, the motion averred that, because of the public apprehension of AIDS, the media coverage of the victim having tested positive for the disease alone would adversely impact defendant's ability to obtain a fair and impartial jury. The motion was heard and denied by the district court on May 5, 1988.[2]
The appropriate standard for review of the denial of a motion for a closed pretrial proceeding when such review is on appeal, after conviction and sentencing, as herein, requires that the defendant show actual prejudice resulting from the denial of the closed pretrial proceeding and that alternative methods of protecting the defendant from the adverse effects of pretrial publicity would not have assured the *573 defendant a fair trial. State v. Birdsong, 422 So.2d 1135, 1137-1138 (La.1982).
In the instant case, defendant made no showing of actual prejudice by the district court's denial of the motion. Furthermore, defendant has not shown that other methods of protecting himself from adverse pretrial publicity would not have assured a fair trial. See State v. McDonald, 404 So.2d 889, 894-895 (La.1981); State v. Kent, 391 So.2d 429, 433 (La.1980).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER 7
By means of this assignment, defendant contends that the district court erred by denying his motion to quash the indictment based on the alleged racially discriminatory selection of grand jury forepersons. Defendant argues that his right to equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution was violated by the systematic exclusion of blacks from service as grand jury foremen. Relying on Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); and Guice v. Fortenberry, 722 F.2d 276 (5th Cir.1984), defendant submits that, once he established a prima facie showing of racial discrimination in the selection of the grand jury foreperson, the burden shifted to the state to rebut the presumption by showing that the pattern of underrepresentation of blacks was the result of a racially neutral selection procedure. On appeal, the state maintains that defendant failed to establish a prima facie case of discrimination[3].
In Rose v. Mitchell (quoting from Castaneda v. Partida), the Supreme Court set forth the standards applicable to a claim of racial discrimination in the selection of grand jury forepersons as follows:
"`[I]n order to show that an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs.' Castaneda v. Partida, 430 U.S., at 494, 97 S.Ct., at 1280. Specifically, respondents were required to prove their prima facie case with regard to the foreman as follows:
`The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time.... This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class.... Finally ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.' Ibid.

Only if respondents established a prima facie case of discrimination in the selection of the foreman in accord with this approach, did the burden shift to the State to rebut that prima facie case. Id., at 495, 97 S.Ct., at 1280."
443 U.S. at 565, 99 S.Ct. at 3005.
See also Guice v. Fortenberry and State v. James, 459 So.2d 1299, 1307-1308 (La.App. 1st Cir.1984), writ denied, 463 So.2d 600 *574 (La.1985), each of which utilized the three-part test of Castaneda in evaluating a claim of racially discriminatory selection of grand jury forepersons.
The applicable procedures pertaining to the selection of grand jury forepersons in East Baton Rouge Parish are contained in La. Code Crim. P. art. 413, which provides, in pertinent part, as follows:
"The grand jury shall consist of twelve persons qualified to serve as jurors, selected or drawn from the grand jury venire.
"In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury."
The record reveals that on August 11, 1988, defendant filed a motion to quash the indictment on the basis of his claim of intentional, discriminatory and systematic exclusion of blacks from the position of grand jury foreperson in East Baton Rouge Parish.[4] On September 7, 1988, a hearing was held in regard to this motion.[5]
At the September 7 hearing, defendant presented the testimony of his only witness, Linda Jones, the jury coordinator for the Nineteenth Judicial District Court. Ms. Jones testified that the master selection pool or general venire, from which any given grand jury venire is randomly selected, is made up by first combining the list of registered voters in East Baton Rouge Parish with the list of licensed drivers in East Baton Rouge Parish. From this list, persons are randomly selected and sent questionnaire forms to determine if they are qualified to serve as jurors.[6] All those who return questionnaires indicating that they are qualified are included in the general venire.
The defendant also introduced several exhibits into evidence, including defense exhibits D-3, D-4 and D-5. D-3 was identified by Jones as a list of about thirty names and addresses (her files) of all forepersons who served on East Baton Rouge Parish grand juries from 1978 to 1988. The state and the defense stipulated that, of the thirty names of forepersons submitted by the defense, there were two black females who served as forepersons.[7] Defense exhibit D-5 consisted of copies of the 1980 United States Census information and statistics covering East Baton Rouge Parish.
Defense exhibit D-4 was a copy of a report from the Registrar of Voter's office of the Parish of East Baton Rouge which indicated the number of whites, blacks, and *575 others who are registered to vote. The court did not allow this evidence to be introduced into the record because the report was for the current voter registration rolls and did not apply to the general venire from which the grand jury that indicted the defendant was selected.[8] The court allowed the defendant two days to file a similar report pertaining to registered voters in 1986 before ruling on the motion to quash, but no such report was introduced.
The motion to quash was denied by the district court on October 28, 1988. In denying the motion, the district court made references to the three requisites for establishing a prima facie case of discriminatory selection of grand jury forepersons set forth in Rose v. Mitchell and concluded that defendant failed to make the required prima facie showing.
It is clear that the defendant has established the first part of the Castaneda test, as the black race, of which he is a member, is a recognizable distinct class which has been singled out for different treatment. See State v. James, 459 So.2d at 1308. In regard to the third part of the Castaneda test, one may assume for purposes of this case that the East Baton Rouge Parish method of selecting a grand jury foreman is susceptible of abuse. Cf. Rose v. Mitchell, 99 S.Ct. at 3005. Accordingly, we focus on the remaining element of the Castaneda test, requiring that defendant demonstrate the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve as grand jury foremen over a significant period of time.
Defense exhibit D-5 reveals that, according to the 1980 United States Census, blacks made up 31.3 percent of the total population of East Baton Rouge Parish; and, as per the stipulation of defendant and the state that two of thirty individuals selected as grand jury forepersons over the period of 1978 to 1988 were black, only 6.6 percent of those individuals were black.
However, since the general venire in East Baton Rouge Parish is composed of "qualified"[9] persons drawn from a random list of registered voters and licensed drivers in that parish, the total percentage of a particular minority in the general population does not have a direct bearing on the make-up of the general venire, from which the grand jury venire is randomly drawn, and the grand jury foreman is selected. Rather, it is the percentage of the particular minority in the general population who are either licensed drivers or registered voters, and who meet the five qualifications necessary to become a juror, which is the appropriate percentage to compare with the actual percentage of minority grand jury foremen.
Therefore, in order to make a prima facie showing of discrimination in the selection of a grand jury foreman, the defendant must show a disproportion over a significant period of time between the percentage of an identifiable minority in the general venire or grand jury venire, and the percentage of minority forepersons during that time; and that the selection process is susceptible of abuse. That is, the defendant must show that the percentage of minority persons in the general population who are qualified to serve as grand jurors[10] is disproportionate to the actual number of minority grand jury forepersons over a significant period of time to establish a prima facie case. Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, *576 1225, 31 L.Ed.2d 536 (1972); Newman v. Henderson, 539 F.2d 502, 505 (5th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977); Preston v. Mandeville, 428 F.2d 1392 (5th Cir.1970); Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966), cert. denied 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967); see also, Foster v. Sparks, 506 F.2d 805, 832-33 (5th Cir.1975); United States v. Jenison, 485 F.Supp. 655, 663 (S.D.Fla.1979). To hold otherwise would be to ignore the fact that a substantial percentage of the general population does not meet the five qualifications which must be met in order to serve on a jury, or in this case as grand jury foreman.[11]
In this case the defendant failed to show the percentage of minority persons in the general or grand jury venires, or the percentage of qualified minority persons in the general population, therefore the trial judge was correct in finding that the defendant had not made the required prima facie showing. This assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 8 AND 13
By means of these assignments, defendant contends that the state used peremptory challenges to exclude persons of his race from serving on the petit jury solely on the basis of their race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Thus, he submits that the trial court erred by denying his initial Batson objection and his subsequent motion for a mistrial premised upon the claimed Batson violation.[12]
A peremptory challenge by the state shall not be based solely upon the race of the juror. La. Code Crim. P. art. 795(B). In Batson v. Kentucky, the United States Supreme Court held that the Equal Protection Clause forbids the state from using its peremptory challenges to strike potential jurors of the defendant's race solely on account of their race or the assumption that jurors of the defendant's race will be unable to impartially consider the state's case against the defendant. State v. Spears, 525 So.2d 329, 332 (La.App. 1st Cir.), writ denied, 532 So.2d 175 (La.1988); State v. Brown, 522 So.2d 1110, 1113 (La. App. 1st Cir.1988), writ denied, 548 So.2d 1222 (La.1989).
In Batson the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. In regard to the establishment of such a prima facie case, the Supreme Court stated the following:
"To establish such a case, the defendant first must show that he is a member of a cognizable racial group. Castaneda v. Partida, supra, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977)] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is *577 entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, supra, 345 U.S. [559], at 562, 73 S.Ct. [891] at 892 [97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in selection of the venire, raises the necessary inference of purposeful discrimination.
"In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.... The trial court then will have the duty to determine if the defendant has established purposeful discrimination.21
"21 In a recent Title VII sex discrimination case, we stated that `a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. [564], 573, 105 S.Ct. 1504, 1511, 84 L.Ed.[2d] 518 (1985). Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 575-576, 105 S.Ct., at [1512]."
476 U.S. at 96-98, 106 S.Ct. at 1723-1724.
The record reflects that, in the instant case, the twelve persons selected to the jury were all of the white race. One of two alternate jurors selected was black, and the other was white. Both alternates were excused by the trial court before jury deliberations began during the guilt phase of defendant's trial.
The state used no peremptory challenges during the selection of the alternates. However, during the selection of the twelve persons comprising the twelve-member jury, the state peremptorily excused seven prospective jurors. Four of these were used to exclude persons of defendant's race, i.e., black female prospective jurors, Laura Alexander, Dorothea Jackson and Renee Harris, and black male prospective juror, Ernest Garner.
The record reflects that jury selection began with voir dire examination of twelve prospective jurors, including Laura Alexander and Dorothea Jackson. Immediately after voir dire examination of these twelve prospective jurors had concluded and the state had peremptorily challenged Alexander and Jackson, defense counsel entered a Batson objection to the state's use of peremptory challenges to exclude Alexander and Jackson. The trial court overruled the objection, reserving to defendant the right to reargue his objection after voir dire examination resumed.
Later, after jury selection of the twelve members of the jury and the two alternates was concluded, defense counsel reurged his Batson objection and moved for a mistrial on the basis of the alleged Batson violation. In responding to the objection and motion, the prosecutor asked the trial court to give him a few minutes to peruse the record of the voir dire proceedings and state for the record neutral reasons for exclusion of the four black prospective jurors. In response, the trial court stated that it was recessing the trial and that (upon resumption of the trial after the recess) it would issue a ruling on defendant's *578 motion after first allowing the prosecutor to state his neutral reasons.
When the trial resumed after the recess, the prosecutor explained that, from the beginning of jury selection, it had been his intention to employ a strategy of selecting a jury composed of eight men and four women. The prosecutor noted that that strategy was reflected by the state's use of six of the total of seven peremptory challenges utilized by the state to exclude women. The prosecutor noted that the actual jury consisted of seven men and five women; and he further noted that, although the actual number of women on the jury did not coincide with the state's initial intention of having only four women on the jury, the women accepted by the state were women who could consider the imposition of the death penalty.[13]
The prosecutor then gave specific reasons for peremptorily challenging the four black prospective jurors. The predominate reasons for excluding Dorothea Jackson pertained to the death penalty issue. She was very weak on imposing the death penalty when questioned by the court. She rolled her eyes and appeared as though she could not consider the imposition of the death penalty. Jackson also appeared to be "responsive to whomever questioned her." When the court told her it was her duty to consider the death penalty, she indicated she would consider it. When the prosecutor questioned her, she said she did not believe in the death penalty; and, when the defense counsel questioned her, it appeared as though she did believe in the death penalty. The state did not want to take a chance on someone who was "iffy" on the issue. Jackson also expressed religious, physical and sequestration concerns.
Laura Alexander had problems understanding the questions posed, and she did not appear to possess the intellectual capacity to comprehend the trial proceedings or to recall testimony adduced during the proceedings. Alexander showed signs of instability. She had recently been laid off from her job. Additionally, she was a member of the Greater New God Church.
Renee Harris waffled in regard to the death penalty during voir dire examination by the court, the state, and defense counsel. Even defense counsel stated for the record that Harris waffled during questioning. Robert Wayne Williams, the son of the pastor of Harris' church, had been executed pursuant to a capital offense sentence; and that same church had decided, en masse, to oppose the death penalty. Harris stated her standard of proof as being proof beyond a "shadow of a doubt," and she articulated that she might have a problem with some of the members of her church if she served on the instant jury and rendered a death verdict.
The prosecutor stated that Ernest Garner made him uncomfortable. In articulating the reasons for not being comfortable with Garner, the prosecutor noted that Garner had stated for the record that he did not know if a case existed for which he could consider or return a death verdict. Garner wavered on the issue of the death penalty depending upon whether it was the court, the state, or defense counsel questioning him. The prosecutor also expressed concern in regard to Garner's ministry service for inmates at the downtown jail. Garner said his service as a juror might cause him a problem with his ministry service. Garner also expressed problems in applying the reasonable doubt standard. He wanted to use a higher standard of proof.
After the prosecutor stated his reasons for peremptorily excluding the four black prospective jurors, the trial court ruled that there was no showing of purposeful discrimination on the basis of race; and, on that basis, the court denied defendant's *579 motion for mistrial. By way of elaboration, the trial court indicated that, even assuming for purposes of argument that defendant had established the requisite prima facie case of purposeful discrimination so as to shift the burden to the state to give neutral explanations for peremptorily excusing the four black prospective jurors, the reasons given by the prosecutor constituted neutral reasons.
Considering all the relevant circumstances surrounding the instant voir dire examination and particularly the fact that defendant was tried by an all white tribunal, a trial court could reasonably have inferred the existence of a prima facie showing of purposeful discrimination. Cf. State v. Young, 551 So.2d 695 (La.App. 1st Cir.1989). Nonetheless, we find that the showing of prima facie discrimination was adequately rebutted by the reasons articulated by the prosecutor for peremptorily challenging each of the four black prospective jurors and that the reasons are supported by the record. Cf. State v. Lindsey, 543 So.2d 886, 898 (La.1989), cert. denied ___ U.S. ___, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Moreover, our examination of the record discloses nothing in the prosecutor's questions or statements during the entire voir dire examination to support any inference of a discriminatory purpose. Hence, defendant failed to establish that there was purposeful discrimination in this case; and, consequently, the trial court properly denied defendant's motion for mistrial alleging a Batson violation. These assignments lack merit.

ASSIGNMENTS OF ERROR NOS. 10, 11, 12, AND 13
By means of each of these assignments, defendant contends that the trial court committed reversible error. In assignments ten and thirteen, defendant asserts that the trial court erred by denying his motions for mistrial based on the circumstance of some veniremen having been exposed to newspaper articles pertaining to the instant case. Defendant claims that one such article referred to another crime allegedly committed by him, i.e., theft of one of the victims' car. Defendant argues that the veniremen's exposure to the articles infringed on his constitutional right to a fair trial and prevented him from being tried by an impartial jury. In assignments eleven and twelve, defendant submits that the trial court erred by denying his challenge of two prospective jurors for cause, i.e., Audrey Dalier and Austin Boudreaux, on the basis that each of them had read or discussed the articles.
The record reveals that voir dire examination began on Monday, March 6, 1989, and continued for the next three days until it was concluded on Thursday, March 9. There were three panels of veniremen used in this case. The first panel consisted of fifty-one persons. The second panel was composed of fifteen individuals, and there were eleven veniremen on the third panel. Individual voir dire examination was conducted in smaller groups of prospective jurors whose names were drawn from the three panels of veniremen. Names were drawn first from the first panel until the names of all members of that panel were drawn. Thereafter, names were drawn from the second panel until the names of members of the second panel were exhausted. At that juncture of the jury selection procedure, names were drawn from the third panel.
On Monday, three persons from the first panel were selected to the twelve-person jury. On Tuesday four more veniremen from the first panel were selected as members of the jury. On Wednesday, after two more prospective jurors from the first panel were selected as members of the jury and after the first two persons whose names were drawn from the second panel were successfully challenged and excused for cause, voir dire continued with the drawing of the names of three more prospective jurors from the second panel. One of these individuals was Bradford Lewis.
Consistent with the voir dire examination procedure employed by the trial court in this case, the court examined the prospective jurors before allowing the prosecutor and then defense counsel to question the *580 prospective jurors. During the questioning by the trial court, Bradford Lewis was asked if he had heard or read anything about this case before coming to court. Lewis answered that he had seen an article in the Monday morning paper and that his boss and his boss's partner had talked about the case yesterday (Tuesday, March 7). Lewis testified that, from what he read on Monday and what he heard discussed by his boss and boss's partner, he had not come to any conclusion about any purported facts about the case or any opinion as to defendant's guilt or innocence. Although Lewis stated that he recalled facts reported in the Monday paper he read, he gave the trial court his guarantee that he could set aside what he read and what he heard discussed and decide the case entirely from the evidence presented in court during the trial; and Lewis elaborated that he had no question he could fulfill that guarantee. Thereafter, (apparently since both the prosecutor and defense counsel were satisfied with the court's questioning and Lewis' answers) neither the prosecutor nor defense counsel questioned Lewis in regard to what Lewis had read or heard about the case. Lewis was selected to serve on the jury, becoming the tenth member of the jury.
The names of two more prospective jurors for voir dire examination, Mary Broussard and Robert Johnson, were then drawn from the second panel of veniremen. During the trial court's voir dire examination of these two prospective jurors, the court asked them if either of them had heard or read anything about this case or had discussed the case with anyone.
Broussard answered that the second panel of veniremen had talked "a little bit" about the case. Broussard testified that no facts of the case were discussed by the panel. According to Broussard, all the second panel knew was that the case was a murder trial. Broussard stated that she did not express any opinion as to the facts of the case and did not hear anyone else do so. Broussard further stated that she could set aside whatever she discussed and heard.
Johnson responded to the trial court's question by stating that there was a daily newspaper which he had read. Later, during defense questioning, Johnson testified that the newspaper was in the hallway outside the room where the members of the second panel waited prior to having their names called for voir dire examination. Johnson stated that he did not know anything about the case until he read the newspaper on Wednesday, March 8. Broussard stated that she did not read the newspaper article. Defense counsel showed Johnson two newspaper articles and asked Johnson if he recognized either of them. The record reflects that Johnson identified one of the articles which was introduced into evidence as Voir Dire Exhibit-1.[14]
According to Johnson, there was a discussion after he read the article. The subject of the discussion was that the article did not give any facts about the case. Johnson testified that the article just stated the nature of the case, no more than what the trial court told him and the other prospective jurors when they came into the courtroom.
*581 Johnson further testified that he did not form any opinion about defendant's guilt or innocence from what he read in the newspaper. Johnson stated that, prior to reading the newspaper of March 8, he had neither read nor heard anything about this case. Johnson further stated that he could totally set aside what he read in the paper and decide the case on the evidence presented in court.
The record reveals that, after Johnson's and Broussard's voir dire examinations were completed both were successfully challenged for cause by the state.[15] After the names of two more veniremen on the second panel were drawn but before their voir dire examination began, defense counsel moved for a mistrial. Defense counsel articulated the basis for his motion as his belief that the testimony of Mary Broussard and Robert Johnson indicated that the second panel of veniremen may have been contaminated and the fact that Bradford Lewis, one of the members of the second panel, was selected to the jury.
In response to the motion for mistrial, the court stated that Voir Dire Exhibit-1 shows that, even if the veniremen read the newspaper article, the article provided no facts about the case. The trial court remarked that the article is actually a news article as to what had taken place in court regarding jury selection in this case. After making the foregoing remarks, the trial court denied the motion and reserved to defense counsel the right to question each and every prospective juror coming before the court for voir dire examination.[16]
Voir dire examination resumed with the questioning of Elton White and Faye T. Deggs, veniremen from the second panel. The trial court began its examination of these veniremen by informing them that the court had become aware that there had been some newspapers in the jury management office today, Wednesday, March 8.
In response to questioning by the court, Deggs stated that she did not read the newspaper article or articles about this case. She testified that she did not recall if she ever read anything at any time about the case. She also stated that, should she recall having read something about the case, she could set it aside and decide the case solely on the evidence.
White told the court that he read articles on March 8 and on each of the two preceding days. White stated that, based on what he read, he did not reach an opinion about any facts in this case nor the innocence or guilt of defendant. During White's examination by defense counsel, defense counsel showed White a newspaper article and asked him if the article was one of those he had read. White identified the article as one of the articles. The article was introduced into evidence as Voir Dire Exhibit-2.[17] White stated that he read the *582 article at home before he came to court. However, White stated that he did see a newspaper in the court building but he did not know if anyone read it.
Deggs was selected as the eleventh member of the jury. White was excluded from serving on the jury pursuant to a defense challenge for cause which the court granted on the basis of White's exposure to the newspaper articles he admitted reading. At this point in the jury selection process, the trial was recessed until 9:30 a.m. Thursday, March 9.
The record reflects that, after the court reconvened on Thursday morning, March 9, the six remaining members of the fifteen-member second panel were subjected to voir dire examination. None of these individuals were selected to the jury.[18]
Thus, the court found it necessary to use members of the eleven-member third panel of veniremen to fill the twelfth position on the jury and that of two alternate jurors. Consequently, voir dire examination continued with questioning of members of the third panel and it was during that questioning that the alleged erroneous denial of defense counsel's challenges of Audrey Dalier and Austin Boudreaux occurred.
During Dalier's initial voir dire questioning by the trial court, she stated that (with the exception of her reading a "little article" on Wednesday night which appeared in that day's Morning Advocate) she had not heard, read or discussed anything about the instant case. However, Dalier testified that the fact that she read the article would not cause her to be biased in any way. Dalier stated that she recalled the article related that, although jury selection was not yet complete, all the jurors who had been selected were white. The only other fact she recalled from the article was something about a young man having been charged with two counts of murder. In response to further questioning by the trial court, Dalier stated that she had not formed any opinion about any fact in this case or about defendant's guilt or innocence by virtue of her having read the newspaper article. Dalier gave the court her absolute assurance that she could set aside what she had read and that it would not affect her decision in this case, and she told the court that she could adhere to her oath as a juror to decide the facts of the *583 case solely on the evidence presented in court. During her questioning by the prosecutor, Dalier indicated that she knew of no reason she could not give defendant a fair trial. The record reflects that defense counsel began his examination of Dalier by showing her voir dire exhibits one and two. Defense counsel asked Dalier if, without reading either of them, she could identify them. Dalier responded by indicating voir dire exhibit two was the article she read. In so indicating, she said: "I think it was this one, I'm not positive. I don't remember. It was yesterday morning." In response to further defense questioning, Dalier testified that she did not remember if the article she read contained facts of the alleged events; but she then recalled that the circumstance of the victims' homosexuality was in the newspaper article.
After Dalier's voir dire examination was concluded, defense counsel challenged her for cause on the basis of her testimony concerning the newspaper article she read and its contents. After the trial court denied the challenge, Dalier was sworn and seated as the twelfth member of the jury.
After the first alternate juror was selected, the voir dire examination of Austin Boudreaux, Jr., began. When the trial court asked Boudreaux if he had heard or read anything about this case, Boudreaux responded that he did not read the newspaper this week but that his wife told him something she read this week about the case. The only thing he recalled that his wife told him was a guy was charged with killing two homosexuals. Boudreaux testified that, from those conversations with his wife, he did not form any opinion as to any fact or as to the innocence or guilt of defendant. Boudreaux stated that he could set aside what his wife told him and decide the case solely from the evidence presented in court. Boudreaux also gave the court his assurance that, if he recalled upon hearing the evidence unfold during the trial that he did in fact read something about the case, he could set aside whatever he recalled.
After the voir dire examination of Boudreaux was completed, defense counsel challenged him for cause on the basis of Boudreaux's exposure to information "concerning the trial in this matter." When the trial court denied this challenge, defense counsel used a peremptory challenge to exclude Boudreaux from the jury.
At the conclusion of jury selection, defense counsel reurged his motion for a mistrial on the basis of the alleged contamination of the jurors by the newspaper articles disclosed during questioning of the second panel of veniremen. In again denying defense counsel's motion for a mistrial on the basis stated above, the trial court stated that it had not been shown that any of the jurors formed any opinions about any fact in this case or about the innocence or guilt of defendant. The court noted that each of the jurors emphatically stated that he did not form any opinions, that he could set aside whatever he read or heard, and that he could decide the case entirely on the basis of the evidence presented in court.

MOTIONS FOR MISTRIAL
La. Code Crim. P. art. 775 provides, in pertinent part, as follows:
"Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial...."
However, a mistrial is not warranted on the basis of a juror's exposure to publicity absent a determination that the juror was actually exposed to the publicity in question and was so impressed by it as to be incapable of rendering a fair and impartial verdict. State v. Russell, 416 So.2d 1283, 1290 (La.), cert. denied, 459 U.S. 974, 103 S.Ct. 309, 74 L.Ed.2d 288 (1982); State v. Hunter, 551 So.2d 1381, 1385 (La.App. 3rd Cir.1989). The determination as to whether or not a mistrial should be granted under La. Code Crim. P. art. 775 is within the sound discretion of the trial court, and a denial of a motion for mistrial will not be disturbed on appeal absent an abuse of discretion. State v. Smith, 433 So.2d 688, 696 (La.1983).
*584 Herein, the testimony adduced during voir dire examination reveals that the only jurors exposed to news media publicity were Bradford Lewis and Audrey Dalier. However, the testimony of each of these jurors revealed that neither had formed an opinion (based on what each had read) as to any facts about the case or defendant's guilt or innocence; and each of these jurors emphatically and unequivocally assured the trial court that they could set aside what they had read and decide the case entirely from evidence presented in court during the trial. Based upon the entire testimony given by Lewis and Dalier and particularly the testimony referred to above, we are convinced that, although these two jurors were exposed to newspaper publicity about the case, neither was so impressed by it as to be incapable of rendering a fair and impartial verdict. Consequently, the trial court correctly denied defendant's motions for mistrial.

CHALLENGES FOR CAUSE
Prior to Louisiana Acts 1983, No. 181, in order to prove reversible error, a defendant needed to show two things: (1) that the trial court erred in refusing to sustain a challenge for cause made by him, and (2) that he exhausted all of his peremptory challenges. State v. Robertson, 518 So.2d 579, 583 (La.App. 1st Cir.1987), writ denied, 523 So.2d 227 (La.1988). However the legislature amended La. Code Crim. P. art. 800 by removing the requirement that a defendant exhaust all his peremptory challenges before complaining of a ruling refusing to sustain a challenge for cause.[19] *585 In the instant case, although the defendant did exhaust all of his peremptory challenges, he need not show this fact in order to obtain review of the trial court's ruling on his challenges for cause. State v. Robertson, 518 So.2d at 583. The trial court is vested with broad discretion in ruling on a challenge for cause, and that ruling will not be disturbed on appeal absent a showing of abuse of that discretion. State v. Jones, 526 So.2d 1374, 1379-1380 (La.App. 1st Cir.1988).
La. Code Crim. P. art. 797(2) provides as follows:
"The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence...."
Herein, the entirety of the voir dire testimony given by Audrey Dalier and Austin Boudreaux reveals that their respective exposures to newspaper publicity did not result in either of them forming any opinion in this case regarding the facts or defendant's guilt or innocence. Each assured the trial court they could set aside what they had read or heard and decide the case based only on the evidence. The circumstances do not indicate that either individual could not be fair and impartial. Thus we find no abuse of discretion by the trial court's denials of defendant's challenges of Dalier and Boudreaux for cause. Cf. State v. Chapman, 410 So.2d 689, 695 (La.1981); State v. McIntyre, 381 So.2d 408, 410 (La.). cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980).
Accordingly, these assignments lack merit.
For the reasons assigned, defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[*] Judge Lewis S. Doherty, III, retired, is serving as judge pro tem. by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] Testimony given by Baton Rouge City Police Detective Elbert Hill at the August 31, 1988, hearing on the motion to suppress defendant's statements, revealed that defendant's primary concern in making the statement was to let the police know that, although he had shot Beshears, Eugene "Cooter" Williams had shot Pleasant.
[2] The record reveals that the ruling on the motion was made by the 19th Judicial District Court Judge Michael E. Ponder and that the case was subsequently transferred to 19th Judicial District Court Judge L.J. Hymel, who was the trial judge in this case.
[3] We note that although we are bound by the decisions of the United States Supreme Court to overturn respondent's conviction if his indictment was constitutionally improper, we subscribe to the view expressed by Justices Rehnquist, Stewart and Powell in their concurring opinions in Rose v. Mitchell, 443 U.S. at 574, 579, 99 S.Ct. at 3009-10, 3012.

Essentially, these Justices take the position that the grand jury does not decide guilt or innocence, only whether a prima facie case exists. Therefore "[a]ny possible prejudice to the defendant resulting from an indictment returned by an invalid grand jury thus disappears when a constitutionally valid trial jury later finds him guilty beyond a reasonable doubt." Rose, 443 U.S. at 575, 99 S.Ct. at 3010, Stewart, with Rehnquist joining, concurring. (Footnote omitted.)
[4] Although the issue raised on appeal relates only to the alleged discriminatory selection of grand jury foremen of the black race, the motion to quash also alleged discrimination as to women, young adults, orientals and Spanish named persons for the position of grand jury foreman. Additionally, by separate motion to quash the indictment, defendant challenged the composition of the grand jury and petit jury venires alleging intentional, discriminatory and systematic exclusion of blacks, women, young adults, orientals, Spanish surnamed persons and newly naturalized persons in the selection of grand juries, petit juries and grand jury forepersons in East Baton Rouge Parish. Both motions to quash were heard at the September 7, 1988, hearing.
[5] The record reflects that the hearing was conducted before 19th Judicial District Court Judge Michael E. Ponder.
[6] La. Code of Crim. P. art. 401 provides in pertinent part:

"A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service.
(2) Be at least eighteen years of age.
(3) Be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
(4) Not be under interdiction or incapable of serving as a juror because of a mental or physical infirmity, provided that no person shall be deemed incompetent solely because of the loss of hearing in any degree.
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned."
[7] An examination of D-3 reflects that it in fact contains the names and addresses of twenty-nine forepersons.
[8] Ms. Jones testified that a new general venire is composed every two or three years, and the one from which the grand jury at issue was selected from was formed in July of 1986. The report which the defense attempted to introduce was current when it was introduced in September of 1988.
[9] See footnote 6 supra.
[10] We note that since the actual selection of the general venire and grand jury venire is random, and it has not been suggested that any discriminatory practices are utilized therein, that the percentage of qualified minority persons in the general population should be substantially the same as the percentage of that same minority in the general and grand jury venires. Although it may be difficult if not impossible to prove the percentage of qualified minority persons in the general population, the percentage of minority persons in the general or grand jury venires should be relatively easy to prove.
[11] Ms. Jones, the jury coordinator for the Nineteenth Judicial District Court, testified that out of approximately ten thousand prospective jurors randomly chosen from the combined drivers license and registered voters list, anywhere from five thousand to six thousand of those potential jurors indicate on the questionnaire form sent to them that they meet the five qualifications necessary to be a juror, and that those five or six thousand will then make up the general venire.

This means that among registered voters and licensed drivers, only forty to fifty percent are qualified to serve on a jury. Given the fact that one of the qualifications for being a juror is that a person be eighteen years old or older, an even lower percentage of the general population is qualified to serve on a jury.
[12] Defendant's motion also asserted as an additional basis for mistrial that the jury had been contaminated during the jury selection process by virtue of the circumstance of some of the veniremen having read certain newspaper articles (pertaining to the instant case), while the veniremen were in or near the jury management office where they had been kept prior to being called for voir dire examination. We note that this additional basis does not relate to the arguments relative to the Batson claim advanced by defendant under the heading "ASSIGNMENTS OF ERROR NOS. EIGHT AND THIRTEEN." However, the additional basis does relate to defendant's arguments appearing hereinafter under the heading "ASSIGNMENTS OF ERROR NOS. TEN, ELEVEN, TWELVE, AND THIRTEEN."
[13] In explaining the basis for his intended strategy of selecting only four women to the jury, the prosecutor stated that on the basis of recent Gallop Polls there seemed to be a dichotomy between the male and female genders insofar as the imposition of the death penalty in capital offense cases. The prosecutor noted, apparently on the basis of the polls to which he referred, that there seems to be a greater percentage of men who consider imposition of capital punishment than women; and, for that reason, the state began the trial with its intended strategy of selecting only four women.
[14] Voir Dire Exhibit-1 is an undated newspaper article published under the name of Advocate Staff Writer Angela Simoneaux. The article is entitled, "Four More Jurors Chosen for Young's Murder Trial," and it begins by stating that four more jurors were seated Tuesday in Sean Young's two-count murder trial. It notes that three jurors were seated on the previous day, that the seven jurors selected so far are white and that Young is black. The article further notes that jury selection will resume Wednesday.

The article also provides information concerning: the backgrounds of each of the seven persons chosen to serve on the jury, the subject matter about which prospective jurors were questioned, the names and addresses of the two victims of the instant offenses and defendant's co-perpetrators, the prosecutor's statement that defendant and his co-perpetrators are accused of murdering the victims during an armed robbery and that the victims were homosexuals, the penalty phase of the trial, and the fact that defendant and his co-perpetrators were not arrested until nearly a week after the discovery of the victims' bodies.
[15] Each of these challenges was made and granted on the basis of the prospective juror's inability to consider the imposition of the death penalty.
[16] The record shows that immediately after denying the motion for mistrial, the court addressed seven of the eight remaining veniremen from the second panel of veniremen. The eighth veniremen had temporarily gone to another part of the court building on a personal errand. In its address, the court noted that it had been informed that there were newspapers in the area where the second panel was being kept; and the court admonished the veniremen that the court did not want any of them reading any newspapers "period" until they were either excused or accepted as a juror and had completed their jury service. The court also admonished the veniremen not to listen to any news stories about the case on radio and not to listen to or watch any such stories on television. The court told the veniremen to convey the subject of its address to the panel member not present at the address. Additionally, the court ordered that any newspapers present in the area of the jury management pool be removed.
[17] Voir Dire Exhibit-2 is an undated newspaper article written under the name of Advocate Staff Writer Tim Talley. The article is entitled, "First Two Jurors Chosen for Murder Trial." The article begins by stating that two jurors were being sequestered Monday night following the first day of jury selection in Sean Young's first degree murder trial. The article states that jury selection will resume Tuesday.

This article gives a brief description of backgrounds of the two jurors referred to at the beginning of the article. The article also provides information concerning the names and addresses of the victims, the prosecutor's statement that defendant and his co-perpetrators are accused of murdering the victims during an armed robbery and that the victims were homosexuals, the subject matter about which prospective jurors were questioned, the penalty phase of the trial, and the date of defendant's and his co-perpetrators arrests.
Additionally, the article relates that according to authorities the victims picked up the perpetrators at a liquor store and took them to the residence of one of the victims. After having drinks with the victims, the perpetrators robbed the victims. Co-perpetrator Eugene Williams tied up victim Benjamin Beshears, Jr., in a bedroom where he was beaten and pistol-whipped. Defendant is accused of shooting Beshears in the head. Defendant tried to shoot victim Terry Pleasant as defendant and his co-perpetrators were leaving, but the gun defendant used misfired. Co-perpetrator Carl Patrick Price repaired the gun and gave it back to defendant. Defendant then shot Pleasant in the head. The article concludes by stating that Price and defendant are accused of stealing Beshears' car.
[18] The six remaining veniremen from the second panel were: Marshall Honore, Lee Fuller, William McKinney, Columbus Muse, Waver Causey and Hector Azuara. Honore was excused on the state's challenge for cause which was made and granted based on Honore's relationship to one of the defense attorneys. Azuara was successfully challenged for cause by the state because he felt his opposition to the death penalty would impair the performance of his duty as a juror in regard to imposition of the death penalty. Muse was excluded for health reasons on a joint challenge for cause.

Fuller testified that he had not read or heard anything about this case before coming to court. He saw a newspaper in the jury management office but did not read anything about the case. Fuller was peremptorily excused by the defense.
McKinney testified that he had not heard anything about this case before he came to court. On Monday night (March 6), he read a newspaper article revealing how many jurors had been selected for the instant trial. There were no facts about the crime in the article, and McKinney stated that he did not see a newspaper in the jury room. McKinney was excluded from the jury by a joint challenge for cause made and granted on the basis McKinney had already obtained airline tickets for a trip to California.
Causey testified that there were newspapers in the jury management office, but she stated that she did not read any of them. She was excused on a challenge for cause by the defense. The challenge was made and granted based on Causey's testimony that she would not consider any mitigating factors in considering the imposition of the death penalty.
[19] In prior decisions of this court, including State v. Robertson, 518 So.2d 579, 583, (La.App. 1st Cir.1987), writ denied, 523 So.2d 227 (La. 1988); State v. Burge, 498 So.2d 196, 203-204 (La.App. 1st Cir.1986); and State v. Edwards, 459 So.2d 1291, 1293 (La.App. 1st Cir.1984), we concluded that Act 181 of 1983 (which took effect on August 30, 1983) amended La. Code Crim. P. art. 800 by removing the requirement that a defendant exhaust all his peremptory challenges before he can complain of a ruling refusing to sustain a challenge for cause.

Recently in State v. Neil, 540 So.2d 554, 555 n. 1 (La.App. 3rd Cir.1989), our brothers of the third circuit disagreed with our interpretation of the 1983 amendment to La. Code Crim P. art. 800. They opined that a showing that all peremptory challenges have been exhausted is still required.
Notwithstanding the views of our brothers of the third circuit, we adhere to our conclusion as set forth in Robertson, Burge and Edwards for the reasons set forth in those cases. However, we amplify those reasons in the following respects.
La. Const. Art. III, Section 15(A), relative to legislative bills provides, in pertinent part, that "[e]very bill, shall contain a brief title indicative of its object." The title to Act 181 of 1983 sets forth its object, to-wit:
"AN ACT
"To amend and reenact Code of Criminal Procedure Art. 800, relative to trial by jury, to eliminate the requirement that peremptory challenges be exhausted before objection to rulings on challenge for cause may be made, to provide certain procedures and requirements relative to such objections, and otherwise to provide with respect thereto."
[Emphasis added.]
As amended by Act 181 of 1983, La. Code Crim. P. art. 800 provides in pertinent part:
"A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection."
Prior to the 1983 amendment, this paragraph read:
"A defendant cannot complain of a ruling refusing to sustain a challenge for cause made by him, unless his peremptory challenges shall have been exhausted before the completion of the panel."
Accordingly, consistent with the title to Act 181 of 1983, the Act eliminated the procedural prerequisite of the pre-Act 181 version of La. Code Crim. P. art. 800 that a defendant could not complain of a ruling refusing to sustain a challenge for cause made by him unless he had exhausted his peremptory challenges. This interpretation of the 1983 amendment is consistent with the majority and concurring opinions as expressed in State v. Vanderpool, 493 So.2d 574 (La.1986). See also State v. Mitchell, 475 So.2d 61, 62 (La.App. 2d Cir.1985).
The Neil decision ignored the provisions of La. Code Crim. P. art. 800 presently in effect, by following Official Revision Comment (a) pertaining to the pre-Act 181 of 1983 version of La. Code Crim. P. art. 800 which is no longer in effect. The third circuit also relied on State v. Smith, 491 So.2d 641 (La.1986). However, our examination of Smith reveals that Smith was involved in a crime committed on January 6, 1983. The case does not indicate the date of the defendants' trial, which we presume occurred before the effective date of Act 181. In regard to the other authority upon which the third circuit relied, i.e., State v. Huber, 504 So.2d 644, 647-648 (La.App. 4th Cir.1987), we must disagree with the fourth circuit's conclusion that the defendant had to have exhausted his peremptory challenges to obtain review of the denial of his challenges of prospective jurors for cause. In Huber, the opinion indicates that the defendant's crime occurred on September 14, 1984. Accordingly, it is apparent that the defendant was tried after August 30, 1983, triggering the applicability of the post-Act 181 version of La. Code Crim. P. art. 800 rather than the pre-Act 181 law utilized by the Huber court.