779 So.2d 675 (2000)
STATE of Louisiana
v.
Frank Ford COSEY.
No. 97-KA-2020.
Supreme Court of Louisiana.
November 28, 2000.
Rehearing Denied January 12, 2001.
*677 Rachel Chmiel, Clive Adrian Stafford Smith, for applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, Beau James Brock, John Allison Cannon, Thomas Walsh, Richard Christopher Nevils, for Respondent.
VICTORY, J.
On July 31, 1990, an East Baton Rouge Parish grand jury indicted defendant Frank Ford Cosey for first degree murder in violation of La. R.S. 14:30. The jury found defendant guilty as charged at trial and, at the penalty phase, unanimously returned a verdict of death finding: (1) defendant was engaged in the perpetration or attempted perpetration of an aggravated or forcible rape; (2) defendant has previously been convicted of an unrelated armed robbery; and (3) the offense was committed in an especially heinous, atrocious, and cruel manner. Defendant now appeals his conviction and sentence to this Court raising 19 assignments of error in 48 arguments.[1] None of the claimed errors are meritorious. Therefore, we affirm defendant's conviction and sentence.

FACTS
On July 6, 1990, Sharon Horton, the victim's mother, went to work at approximately 2:30 p.m.. She left her 12-year-old daughter, Delky, at home. When Ms. Horton returned from work at approximately 11:30 p.m., Delky was not in the living room watching television as was customary. Ms. Horton walked to the back of the house and found her daughter, naked and in a spread eagle position, on the floor of the master bedroom. Delky's throat had been slashed and she appeared to be dead. Ms. Horton called 911 and then tried to administer C.P.R. until the paramedics arrived and removed her from the house.[2]
Shortly thereafter, Horton saw her neighbor, Patrick Jenkins, and told him that someone had killed her daughter.[3] He asked her if she found a bank in the house, and explained that he had seen Frank Cosey with a bank earlier in the day.[4] The next day, Horton discovered an acrylic bank on her kitchen counter. In addition, she found a piece of pink note paper with the name Frank and defendant's phone number written in Delky's handwriting. Based on the statements made by Jenkins, the police questioned him about the night of the murder and also questioned Frank Cosey as a possible suspect. Once they matched Cosey's fingerprints to prints lifted from the scene, the police obtained an arrest warrant for defendant.
Pat Lane, the forensic scientist who led the crime scene investigation, explained at trial that he collected a white Circle K bag, which contained a grey hat and a steak knife with a wooden handle, found next to the victim's body. He also collected a carving knife which was on the floor by the victim's right leg. This knife was part of a set in Horton's kitchen. Lane also retrieved a purple comforter which was underneath the victim's body. Semen stains on the comforter were tested for DNA evidence and matched to defendant.[5] *678 Lane was also able to match prints taken from the dresser in the master bedroom to defendant's left and right palms. In addition, a print lifted from the Circle K bag was matched to defendant's right little finger.
Officer James Roddy testified that he was one of the officers who arrested Frank Cosey on July 10, 1990. He said that en route to the police station, defendant told the officers that he did not kill the victim, but could help them find who did. Deputy Lonnie Callahan testified at trial that on July 10, 1990, he was involved in the search of Robert Cosey's apartment (where defendant had been living), Robert's car, and the home of defendant's mother.[6] Among other things, he seized an acrylic bank, similar to the one found in the victim's kitchen, from Robert Cosey's apartment. From the dishwasher, he also seized a knife similar to the one found in the Circle K bag at the scene.
At trial, the defense attorneys tried to implicate Jenkins and show that the police never pursued any suspects besides the defendant.[7] They cross-examined several witnesses about Jenkins' nervousness whenever the police questioned people in the neighborhood, and about the fact that he initially tried to suggest that a strange car was at the house the day of the murder, when he knew that the car belonged to Delky's father. Defendant did not testify at trial.

GUILT AND PENALTY PHASE ERRORS

Admissibility of Reebok Tennis Shoes
In his first assignment of error, defendant contends that the trial court erred by allowing the state to introduce into evidence a pair of sneakers which were not relevant because they could not be linked to him.
Relevant evidence is "evidence having any tendency to make the existence of fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." La. C.E. art. 401. To be admissible at trial, demonstrative evidence must first be identified. La. C.E. art. 901. Identification can be visual or by chain of custody of the object. State v. Landry, 388 So.2d 699, 704 (La.1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Overton, 596 So.2d 1344, 1354 (La.App. 1st Cir.), writ denied, 599 So.2d 315 (La.1992). The identification need not be absolute, certain or wholly unqualified. State v. Mills, 505 So.2d 933 (La. App. 2nd Cir.) (sufficient that a preponderance of evidence establishes that it is more probable than not, the evidence is connected with the case, "... the weight to be given to the evidence is a question for the jury."), writ denied, 508 So.2d 65 (La. 1987).
While voir dire was being conducted, the state requested a hearing to determine the admissibility of a pair of Reebok tennis shoes. An investigator at the District Attorney's office had been watching the trial of another case in which the defendant stomped on the victim and left a mark on the victim's face. The investigator realized that the mark on Delky's face might be from the tread of a pair of shoes, rather than from a piece of jewelry as the state originally believed. Thereafter, the bottom of the Reebok tennis shoes was compared against the photographs of the imprint on Delky's face, and the state concluded that they matched.
The defense objected to the admission of the shoes because the state could not link the shoes to defendant and therefore, the defense argued that the shoes were not relevant. At the hearing on this issue, Detective Lonnie Callahan testified that he was given the shoes on July 10, 1990, the night that he conducted searches of defendant's mother's house, Robert Cosey's *679 apartment, where defendant was living, and Robert Cosey's car. He testified that all of the evidence seized was marked and logged in the early morning hours of July 11, 1990, and the Reebok sneakers, identified at trial as S-81A, were bagged on July 11, 1990. The bag containing the tennis shoes was marked "Reebok Tennis Shoes, 7/11/90, L.C. [Lonnie Callahan]." However, the return on the search warrant for Robert Cosey's house only listed 5 items: a pair of Etonic sneakers which were never linked to the case, an acrylic bank, a steak knife, a pair of jeans and a 4-by-2½ piece of sheet rock. Captain D.T. Jones, who prepared the report about the searches, similarly testified that the list of items seized from Robert Cosey's house did not include the Reebok shoes. However, the Reebok shoes were marked and bagged in the same manner as the other seized items that were included on the search warrant return report, i.e., with the name of the item that was in the bag, the date of 7/11/90, and Detective Callahan's initials. Detective Callahan testified that he did not remember who gave him the shoes, and could only say that he received them either at the scene or when the officers returned to the office. He further testified that they searched no other residences in connection with the case on that date. Jones also testified that no items were seized from the house of the defendant's mother.
In ruling that the tennis shoes were admissible, the trial judge ruled:
The court finds in this case that the shoes were items that were seized from the residence of the Cosey brothers, and taking that into consideration, the court has listened to the testimony of Callahan. Although at what point in time they were removed, it was on the 11th when the items were tagged, the 10th or the 11th, so they were done in fairly close proximity in time as to the search, and the court believes that the shoes, in fact, came as a result of the search warrant from the residence. What location in the residence the court has no idea, who delivered the items to the detective the court has no idea, but I think that, in general, the court has determined that the shoes came from the residence of Cosey.
We agree with the trial court's ruling on this issue. While the identification of the Reebok shoes was not absolute or certain, in that they were not listed on the search warrant return as an item of evidence that was seized at Robert Cosey's apartment and Detective Callahan could not recall who gave him the shoes, his testimony establishes that it is more probable than not than the Reebok tennis shoes were seized from Robert Cosey's apartment on July 11, 1990, along with the rest of the evidence that was properly included in the return on the search warrant. The shoes were bagged and tagged in the same manner as the rest of the seized evidence with the date of July 11, 1990 on it. Further, the shoes were sent to the Crime Lab and listed on a "Request for Scientific Analysis" on July 12, 1990 along with the sheet rock, the steak knife, the Etonic sneakers, and the jeans. Whether the shoes actually belonged to the defendant was a matter for the jury to decide.[8] Their admission was proper.
Even if they were wrongly admitted, however, any error is harmless. The question raised by erroneous admission of evidence is whether the trial court's error in admitting it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421, 427-28 (La.1980). To be harmless, the improperly admitted evidence must not have contributed to the verdict. State v. Wille, 559 So.2d 1321, 1322 (La.1990); State v. Banks, 439 So.2d 407, 409 (La. 1983). Despite defendant's claim that he had never been inside the house, the state presented evidence that his fingerprints *680 were on the dresser in the bedroom where the victim's body was found and on the Circle K bag with a knife in it located next to the victim's body. In addition, the DNA evidence indicated that the sperm recovered from the purple comforter found underneath the victim was from defendant. Given this strong evidence, if any error occurred in the admission of the Reebok tennis shoes, it was harmless. This argument lacks merit.
In addition, the defense argues that the trial court erred by allowing the state to call Pat Lane to give expert testimony about the shoes, because he was not qualified in shoe-print analysis.[9] However, in making its ruling that the shoes were admissible, the judge specifically stated, "[n]ow, that being said, the court further determines that the testimony of the experts in this matter will not be allowed." He further clarified:
Colomb will not be allowed as expert testimony nor will Pat Lane be able to testify as an expert as to the imprint markings as a crime scene expert and give an opinion; however he will be allowed to testify as to the pictures that were taken and theor the photos because those are, again, important, and the jury will be allowed to view and make a determination in and of itself as to whether or not these shoes or that one shoe made the imprint or the mark on this child's face and will also be allowed to determine whether the prosecution has adequately linked these shoes to the defendant.[10]
At trial, when the state attempted to get Lane to testify that the tread of the shoe matched the imprint which he photographed on the victim's face, the defense objected and the judge called the attorneys to the bench. After they discussed the matter, the court reiterated that Lane could testify about taking the photographs, the location of the mark, could view the bottom of the shoe, and show which area he compared, but he could not make the comparison. The defense did not object to this ruling, and Lane's testimony in front of the jury complied fully with the judge's ruling. Consequently, this argument lacks merit.

DNA Test Results
In his second assignment of error, defendant argues that he was denied a fair trial because the defense was forced to turn over the results of its DNA tests.
The purple blanket taken from underneath the victim's body contained sperm stains which the state submitted to GenTest Laboratory in Metairie, Louisiana, for DNA testing. GenTest determined that there was not a sufficient amount of sample to perform RFLP (Restriction Fragment Length Polymorphic) DNA testing. and therefore conducted PCR (Polymerase Chain Reaction) DNA testing.[11] Based on this PCR test, Dr. Sudhir K. Sinha, who performed the test, concluded that Frank Cosey could not be excluded as the sperm donor and the genetic profile for the ten markers analyzed occurs with a frequency of one in 4.7 million persons in the African-American population. Once the state obtained its results, it turned *681 over the remaining sample to the defense so that it could perform its own testing. The defense hired Serological Research Institute in California to analyze the sample. On September 18, 1992, in court, the state requested that it be allowed to participate in the defense test on the ground that if the sample was retested it might be exhausted. The defense objected and argued that, in addition to testing the sample, the expert was also going to advise the defense on how to cross-examine other experts. The court denied the state's motion on the condition that if the defense intended to use the results of its test, then it had to turn over all the relevant documents to the state.
Thereafter, with the sample available at that time, Serological was able to perform a PCR test and an RFLP test. When the defense received the results, it decided that it would not use them at trial. However, the state asserted at a hearing on July 13, 1994, that it was entitled to the reports. The prosecutor argued that it was fraudulent to conceal the evidence from the jury, and that the defense destroyed the evidence which precluded the state from performing any further analysis. The prosecutor alleged that a "tremendous amount of the substance was consumed. And when we received the remainder, my laboratory told me that there was not a sufficient sample to conduct the RFLP that we would like to have conducted." The defense responded that the state tested the evidence first, and at that time, with the entire original sample, GenTest said that there was not enough material to perform RFLP, and so used the PCR method. The defense pointed out that thereafter, even after part of the sample was consumed by the state, Serological was able to perform a PCR test and an RFLP test on the sample. The defense also pointed out that the state had the sample for three years after the murder and before the defense had it, and never performed the RFLP test. The court ruled that because the defense was not going to use the results of the test the state was not entitled to them. The state subsequently took writs, and this Court reversed the trial court and ordered the defense to turn over the results of the testing from its expert.[12]State v. Cosey, 95-0039 (La.3/30/95), 652 So.2d 993.
In a hearing on May 5, 1995, the state asked the trial court to execute this Court's order. The defense argued at that time that the decision of this Court was based on an erroneous factual premise that the evidence had been consumed. The defense further stated that it was not able to call its expert to testify about whether or not additional testing could be performed on the remaining material because the expert's bill had not been paid and the expert would not assist the defense further until he received payment.[13] However, defense counsel had raised his argument in his pre-trial application, arguing that this Court only had the prosecution's allegations that the evidence was exhausted, based upon the opinion of an expert who originally said there was not enough material to conduct an RFLP test when one was later conducted after a portion of the material was consumed.
The trial court ruled that it had no choice but to enforce the order of this Court. The defense turned over the material, and ultimately, in an attempt to limit the negative impact of the evidence, agreed to a stipulation at trial that defendant *682 was the source of the sperm on the blanket found in the victim's room.
Even if a defense expert would have testified that there was sufficient material left to do RFLP testing, defendant cannot show reversible error. First, there was evidence presented by the state's expert that there was not sufficient material left to perform the RFLP test. Therefore, this Court would have been left with conflicting opinions if the defense had an expert testify that a RFLP test could be performed. More importantly, defendant cannot show that he was prejudiced by the state gaining access to the RFLP results. The state's expert tested the sample and concluded that Frank Cosey could not be excluded as the sperm donor and that the genetic profile for the ten markers analyzed occurs with a frequency of only one in 4.7 million persons in the African-American population. Consequently, if the state did not have access to the RFLP results, it could have relied on the PCR results at trial which provided strong evidence that the defendant was the source of the sperm. PCR testing is a widely accepted scientific method of DNA testing. See United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997) (PCR analysis reliable and admissible under the standard established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); United States v. Hicks, 103 F.3d 837, 845-46 (9th Cir.1996), cert. denied, 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997) (same); see also State v. Hoffman, 98-3118, pp. 22-24 (La.4/11/00), 768 So.2d 542, 565-66.. Therefore, defendant cannot show that, even if the previous ruling of this Court was based on a faulty factual premise, he was prejudiced. This assignment lacks merit.

Grand Jury Foreperson Discrimination
Defendant next argues that his case should be remanded for a hearing on discrimination in the selection of the grand jury foreperson because African-Americans, women, young adults, Orientals, and Spanish people were under-represented.[14]
To demonstrate an equal protection violation in the context of grand jury selection, a defendant must establish a prima facie case of purposeful discrimination by showing that: (1) those discriminated against belong to an identifiable group in the general population; (2) the selection process is subject to abuse; and, (3) the degree of underrepresentation, as shown "by comparing the proportion of the group[s] in the total population to the proportion called to serve as grand jur[y] [forepersons], over a significant period of time." Castaneda v. Partida, 430 U.S. 482, 494-495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)(emphasis added). African-Americans and women are identifiable groups capable of being singled out for disparate treatment. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (peremptory strikes based on gender or race are prohibited by the Equal Protection Clause). There is no question that at the time of trial in the present case Louisiana's procedure for selecting grand jury forepersons was subject to abuse according to subjective criteria which may include race and sex. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998); Johnson v. Puckett, *683 929 F.2d 1067, 1072 (5th Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). The legislature has recently addressed this problem in light of the decision in Campbell and amended Article 413 to provide for random selection of the grand jury forepersons from the names drawn indiscriminately and by lot from the grand jury panel. 1999 La. Acts. 984.
At the hearing on the motion to quash, the defense called Linda Jones, the Jury Coordinator for the Nineteenth Judicial District Court. Ms. Jones testified that although she could produce the grand jury lists from April of 1978 to the present, information about race was not available from the lists or any other source, as her office was prohibited from keeping those kinds of records based on race. She further testified that she had previously testified in the case of State v. Young, 569 So.2d 570 (La.App. 1 Cir.1990), writ denied, 575 So.2d 386 (La.1991), relative to grand jury discrimination and that she was also unable to produce any information on the race of the grand jury or grand jury forepersons at that time. During cross-examination by the state, the prosecutor asked her if she was aware of any documents filed in the Young case relative to grand jury discrimination and she said she was not aware of any such documents. No other witnesses were called by the defense.
The state then attempted to offer and file into evidence the complete record of State v. Young, claiming that there was a memo in the file prepared by the judge in that case relative to the race of the various grand jury forepersons. However, the state did not have possession of the record. When asked if it had any objection to the evidence being admitted, the defense responded that it hadn't seen the evidence before and would like to see it before it was admitted. Therefore, the court ruled "I don't think you can do it until they have a look at it. I will leave it open for you. Let them take a look at it first." The court then denied the motion to quash, but left the record open to give the defense the opportunity to review evidence submitted on the issue in the case of State v. Young before the evidence would be admitted. From our review of the record, it appears that the evidence was never submitted as it is not contained in the record.[15]
Thus, the trial court properly denied defendant's motion to quash the grand jury indictment. While Campbell makes it abundantly clear that Louisiana's procedure for selecting grand jury forepersons was subject to abuse because it placed untrammeled discretion in the trial judge on a matter of the pre-1999 version of La.C.Cr.P. art. 413(B) to select one juror on each grand jury panel, defendant did not present any direct evidence that there was underrepresentation stemming from intentional discrimination. Consequently, the defense did not carry its burden of proof to establish a prima facie case of purposeful discrimination.
In this Court, the defense has filed a motion to supplement the record with statistics allegedly showing that in the twenty years up to and including defendant's indictment, women were significantly *684 underrepresented as grand jury forepersons in the 19th Judicial District. This Court referred this motion to the merits. However, the defense had the burden of proof at the trial court level and was afforded a hearing. It was the defense's obligation to supplement the record with any evidence in support of its claim of discrimination and it did not do so.[16] We will not consider it here and defendant's motion is denied. This assignment of error lacks merit.

Patrick Jenkins
Defendant argues that he was erroneously and unconstitutionally limited from presenting a full defense because he was not allowed to introduce evidence which showed that Patrick Jenkins committed the murder. Jenkins also lived across the street from the victim and he and defendant knew each other. As stated earlier, Jenkins was the person who asked the victim's mother whether she had found a bank in the house after the murder and told her that he had seen defendant with a bank earlier in the day. When the victim's mother found the bank on her kitchen counter the next day, she alerted the police and they subsequently questioned defendant about the murder.
The defense argued at trial that the police investigation was inadequate and that the investigators failed to pursue Jenkins as a suspect despite his suspicious behavior after the crime. However, the defense was not allowed to admit evidence at trial to show that Jenkins had a history of violent criminal behavior and on March 18, 1994, killed himself after murdering his baby and the baby's mother.
A criminal defendant has a constitutional right to present a defense. U.S. Sixth Amend.; LSA-Const. Art. 1, § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074, 1078-1079 (La. 1989); State v. Vigee, 518 So.2d 501, 503 (La.1988); State v. Caldwell, 504 So.2d 853, 855-56 (La.1987); State v. Shoemaker, 500 So.2d 385, 389 (La.1987); State v. Hamilton, 441 So.2d 1192, 1194 (La.1983). All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402. La. C.E. art. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, risk of misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403; See State v. Mosby, 595 So.2d 1135, 1138 (La.1992). Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned. State v. Vaughn, 431 So.2d 358, 361 (La.1982); State v. Bates, 397 So.2d 1331, 1334 (La.1981) (same); State v. Stramiello, 392 So.2d 425, 427 (La.1980) (same).
Defendant sought to admit evidence of several prior crimes committed by Jenkins as follows: (1) the police report of the murder-suicide incident in which Jenkins shot his baby, his baby's mother, and killed himself; (2) evidence that in July of 1993, Jenkins stole a car and told the woman who owned it that he would kill her if she reported the crime to the police; she nevertheless reported the crime, and the next day he ran his car into her car and was arrested and charged with four counts of attempted murder; (3) evidence that in September of 1993, the Covington police were dispatched to a home because Jenkins refused to leave, resisted arrest, and threatened to kill the woman who called the police; and, (4) the affidavit of probable cause that showed that the Baton *685 Rouge police arrested Jenkins after he was discovered hiding in a woman's closet.
Defendant fails to show that the trial judge's ruling excluding the evidence because of the danger of unfair prejudice was an abuse of the court's discretion. The defense was allowed to cross-examine witnesses about Jenkins' suspicious behavior after the crime and was able to elicit testimony that he might have been making obscene phone calls to the victim's mother.[17] In addition, the defense questioned police about their failure to investigate Jenkins further despite the fact that he lied and gave them a false lead. However, although Jenkins was seen with defendant on the night of the crime, there was no evidence linking Jenkins to the scene or the murder.
Finally, the other crimes which Jenkins committed were not similar to the instant offense. Defendant argues in his brief that this Court indicated in Mosby, that evidence which would be relevant to showing that it is less probable that defendant committed a crime included cases:
Where a third person who has committed similar crimes is shown fairly surely to have committed the charged crime. Cases where, without evidence of involvement in the charged crime, another person is shown to have committed similar, although not distinctly similar crimes, in the same community during the same time frame.
Id. at 1139. However, this Court goes on to state in Mosby, that:
Yet, it is evident that in the stronger hypothetical mentioned, the defendant's constitutional right to present a defense cries out for admission of the evidence, while in weaker, it would be a waste of time, tend to confuse or mislead the jury, and unfairly prejudice the state to permit introduction of the evidence.
Id. Consequently, here, the defense was attempting to bolster its theory that Jenkins was responsible for the murder by attacking his character and trying to suggest that because he was a bad person he was the perpetrator. Under this circumstance, the judge was correct in ruling that any probative value was outweighed by the danger of unfair prejudice and properly prohibiting the defense from admitting the evidence.
Defendant also contends that the trial court erred by excluding evidence of the polygraph tests taken by defendant and Patrick Jenkins. He argues that polygraphs have probative value in the instant case, and therefore, the results should have been admitted into evidence. In addition, defendant argues that even if the reports were not admissible at the guilt phase, they should have been admissible at the penalty phase.
This Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. Consistent with this view, the Court has made it clear that the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject *686 matter of his testimony." State v. Hocum, 456 So.2d 602, 604 (La.1984); State v. Tonubbee, 420 So.2d 126, 132 (La. 1982 ), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Catanese, 368 So.2d 975, 981 (La. 1979). Such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully." Hocum, 456 So.2d at 604-605. Therefore, the trial court correctly ruled that no evidence of the polygraph results was admissible at trial.
However, during trial the state attempted to admit a police report which listed all of the items seized from Robert Cosey's and did not include the Reebok shoes. Thereafter, the following occurred:
Mr. Holthaus: I would offer and introduce into evidence Cosey-34.
Mr. Walsh: And that is whatthe arrest report or
Mr. Holthaus: No, it's just Turkey's
Mr. Walsh: Judge, if we are going to do that, what I would like to do is offer all the reports that we have in this case to the jury. I think that's improper. May I approach the bench?
Mr. Holthaus: I can't believe that.
Mr. Marabella: Good.
Mr. Holthaus: It's got the polygraph in them.
Mr. Marabella: Good. Sure, we'll do it. We agree. Let's do it.
Mr. Walsh: Let's do it.
Mr. Marabella: Let's show them all the reports.
Mr. Walsh: That's right. We'll do it. That's fine.
The Court: That's fine with me. Get them together.
Mr. Walsh: That's fine.
Mr. Holthaus: All right. Very good. That's going to take some time, Judge, And it looks like lunch.
The Court: All right, get all the reports together. And anything else for this witness? Anything else for this witness?
Mr. Holthaus: All theI don't know yet, judge. If I could put together all the reports and we'll take it from there.
The Court: When you say all the reports, you're referring to all the police reports; correct?
Mr. Holthaus: All the reports by the police officers.
Mr. Marabella: The ones that they just gave us a month ago.
Mr. Walsh: We'll have to talk about we'll have to talk about this outside the presence of the jury.
Mr. Marabella: Whoa, whoa, whoa, whoa, whoa, you offered and we accepted.
Mr. Walsh: And I haveThat's right. That's right. We have the state police reports. We have all reportsall the reports on this case.
Mr. Holthaus: And the notes from the investigating officers.
Mr. Walsh: I have no problem with that whatsoever, all the reports.
The Court: Wonderful. We'll make them all available to the jury. Thank you.
Mr. Walsh: We will do lunch.
The jury was subsequently excused for lunch, and out of the presence of the jury, the following occurred:
The Court: Do y'all want to put it on the record on this thing about what we're talking to.
Mr. Walsh: Yeah, Judge I need to
Mr. Holthaus: It's on the record.
Mr. Marabella: It's alreadyit's on the record.
Mr. Walsh: No, Judge, I need to talk to you and Mr. Holthaus and Mr. Marabella if they don't mind. I'd appreciate it.
. . . . .

*687 Mr. Walsh: Well, Judge, that's what I'm saying. I think that I'm going to have to consult with my boss. I may withdraw my offer. It depends on what my boss says.
The Court: ThisNo, this has already been done in front of this jury, and it has been agreed to
Mr. Marabella: It has been accepted.
The Court:in court in
Mr. Walsh: Judge, that means all the reports and
The Court: All the police reports and notes is what both sides said in front of this jury.
The prosecutor then argued that that was not his understanding, and he had not agreed to admit all of the reports. The state subsequently attempted to qualify its offer further by suggesting that it was now entitled to call an expert in acrylics to testify about the matter found in the tread of the Reeboks. Finally the Court ruled that the reports, including the polygraph information, were admissible, because both sides agreed in front of the jury that all the reports including the polygraph information could be admitted. However, the court ruled that experts that had been previously excluded would not be allowed to testify.
The state objected to the ruling and took writs. The First Circuit granted the state's application in part, ruling, "[t]he application is granted for the limited purpose of excluding police reports or portions of police reports that refer to the polygraph examination results." State v. Cosey, 96-1154 (La.App. 1st Cir. 6/6/96). The defense subsequently took writs to this Court. This Court affirmed the ruling of the appellate court reasoning that it was not clear that the state intended to include the polygraph reports in its stipulation. Moreover, the Court ruled, "[i]n all events, the reports are inadmissible and their introduction does not serve the interest of the conducting of a fair and proper trial." State v. Cosey, 96-1433 (La.6/7/96), 675 So.2d 732. This Court further held that the remaining reports were admissible and witnesses could be called to explain them, unless defendant showed that he would not have entered into the stipulation if he had known that the polygraph results were not going to be introduced. Id. Thereafter, defendant said that he did not want to admit the reports, and the reports were not admitted at trial.
The defense now argues that this Court was misled in its ruling by the state's argument that it did not hear the reference to the polygraph reports and never intended to include them in the stipulation. However, this Court did not ultimately base its ruling on whether or not the state intended to include the reports. This Court specifically ruled, "In all events, the reports are inadmissible and their introduction does not serve the interest of the conducting of a fair and proper trial." Id. (Emphasis added). Given that the defense does not provide any additional evidence to suggest that this Court should depart from its earlier ruling, as well as its longstanding position that the polygraph reports are inadmissible because any probative value is so outweighed by its accompanying dangers, this portion of defendant's argument lacks merit.
Defendant also argues that this Court's ruling in State v. Catanese, supra, supports the admission of the polygraph test results in the penalty phase.[18] Defendant points out that Catanese sanctions admission at post-verdict hearings when guilt or innocence is not an issue. Id. 368 So.2d at 982-983. With his guilt already decided and the sole matter pending being the appropriate punishment, defendant contends that polygraph reports should have *688 come in as mitigation evidence.[19] However, this Court addressed a similar argument in State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, and stated that the penalty phase of a capital murder trial is not a post-trial proceeding within the meaning of Catanese and held that polygraph evidence is not admissible in the penalty phase. This Court explained:
The reasons for Catanese's proscription against the introduction of polygraph evidence in a criminal trialthe almost conclusive weight a trier of fact will give it, its questionable quality, and the lack of procedural rules governing its quality and introductionapply with even more force to the most important decision any criminal jury will have to make.
Robertson, 712 So.2d at 36. Consequently, the trial court properly excluded the polygraph reports from the penalty phase, and this argument lacks merit.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct. R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The Department of Corrections has submitted a Capital Sentence Investigation Report and the State filed a Sentence Review Memorandum. The Capital Sentence Investigation Report indicates that defendant is a black male born on December 14, 1959. Defendant refused to be interviewed for the sentence investigation report, and the probation officer spoke with defendant's mother and relied upon a presentence investigation report prepared in 1983 to gather defendant's social history. Defendant is the third of five children born to Effie and Frank Cosey, Sr. and he was born in Zachary, Louisiana. Defendant's father died in 1979, when defendant was 20 years old.
Defendant attended Beechwood Elementary School, Baker Junior High School, and Baker High School, and school records reflect that he withdrew from school on October 24, 1977. Nothing in the school records indicate that defendant caused any trouble or was the subject of disciplinary action while he was a student. Defendant allegedly left school because he needed to get a job so that he could support his mother who was sick at the time. According to defendant's mother, Mrs. Cobb, defendant worked on his GED while incarcerated at Angola. Defendant enlisted in the U.S. National Guard in October of 1981 and received an honorable discharge in August of 1982. The only employment information available indicates that defendant *689 worked as a laborer for Louisiana Pride for one month in the fall of 1982. Defendant married Darlene Taylor on December 9, 1979, in Baton Rouge, Louisiana, and the marriage was annulled on January 10, 1980. Defendant has an adult daughter, Latashia Griffin, from a relationship with a woman named Pat Griffin, but defendant has not had significant contact with his daughter.
According to defendant's mother, defendant does not have any known physical or mental health problems and was not the victim of any physical or sexual abuse as a child. Mrs. Cobb further reported that she considered her son to be hot tempered and easily angered. She said that he used marijuana frequently prior to the instant offense, but she was not aware of him using any other illegal substances and she said that he only occasionally drank alcohol. However, during the penalty phase of the instant case, defendant admitted into evidence records from the Louisiana Department of Corrections Blue Walters Substance Abuse Program.
Defendant does not have any known juvenile criminal record. As an adult, he was arrested in September of 1985 for armed robbery and felony theft. He subsequently pled guilty to one count of armed robbery and on April 30, 1987, was sentenced to five years at hard labor, without benefit of probation, parole, or suspension of sentence. However, on January 6, 1989, defendant was released on parole supervision. While on parole, he was arrested for the instant offense.

Passion, Prejudice, or Other Arbitrary Factors
The record does not provide any indicia of passion, prejudice, or arbitrariness. Both defendant and the victim were African-American, and nothing in the record suggests that race was an issue at trial.

Aggravating Circumstances
The state presented sufficient evidence to demonstrate the aggravating circumstances that defendant was engaged in the perpetration or attempted perpetration of an aggravated or forcible rape; defendant has previously been convicted of an unrelated armed robbery; and the offense was committed in an especially heinous, atrocious, and cruel manner. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Proportionality
The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 23 occasions, including the current case. In State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986), jurors in the Nineteenth Judicial District imposed the death penalty in a factually similar case where the defendant raped and murdered an eleven-year old girl. Further, this Court has affirmed capital sentences statewide based primarily on the jury's finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape. See, e.g., State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Wille, supra; State v. Lee, 559 So.2d 1310 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); State *690 v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Carmouche, 508 So.2d 792 (La.1987); State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987); State v. Loyd, 489 So.2d 898 (La.1986) (fourth penalty phase hearing presently pending); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Watson, 449 So.2d 1321 (La.1984), 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); State v. Rault, 445 So.2d 1203(La.), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); State v. Celestine, 443 So.2d 1091 (La.1983); State v. Willie, 436 So.2d 553 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984); State v. Moore, 414 So.2d 340 (La. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).
In addition, Louisiana juries have frequently imposed capital punishment for crimes committed in the home. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Code, 627 So.2d 1373 (La.1993); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Summit, 454 So.2d 1100 (La.1984), cert. denied, 470 U.S. 1038, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985); State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). Wingo observed in this regard that "[t]he murder of a person by an intruder violating the sanctuary of the victim's own home [is] a particularly terrifying sort of crime to decent, law abiding people." Id., 457 So.2d at 1170. Based on these reasons, defendant's death sentence is not disproportionate.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. Art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state postconviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[1] Assignments of error not treated in this opinion are addressed in an Unpublished Appendix to this opinion.
[2] Her daughter was dead when the paramedics arrived.
[3] Jenkins and defendant each lived across the street from the victim, though not in the same apartment.
[4] Alfred Cobb testified at trial that on the night of the murder he and Patrick Jenkins were working on a car when the defendant came and started talking to them. He brought them a drink, and then he left and came back with a bank. He told them he made the bank at work and was going to give it to a small boy. Sharon Horton testified that Frank Cosey used to spend time with her son Jeremy.
[5] The parties entered into a stipulation that the sperm specimen taken from the purple blanket was deposited by defendant.
[6] Nothing was seized from the car or the home of defendant's mother.
[7] At the time of trial Jenkins was deceased.
[8] Robert Cosey testified that the shoes did not belong to him.
[9] At a hearing on the admissibility of the evidence conducted under Rule 104 of the Louisiana Code of Evidence, Pat Lane did not say, when asked, that the mark that was left on the victim was by a Reebok tennis shoes, but stated:

I would certainly characterize it in that good old crime lab language, it's consistent with, you know, and I think that that's all you can say. It's consistent with it. You can't exclude it. Is there something else that could have made that mark? It may very well be and that something else may be another pair of tennis shoes just like those.
[10] Pat Lane took the photographs which showed the imprint on the victim's face.
[11] PCR testing is the preferred method when the sample is small and relatively degraded as was the sample in the present case. In contrast, RFLP testing requires a large sample size with little degradation, but because it analyzes a longer strand of DNA, it provides greater statistical significance.
[12] This Court reasoned that although the test results were not discoverable under La. C.Cr.P. art. 725 because the defense did not intend to use them, "fundamental fairness and the extraordinary circumstances presented by this case" required that the results be turned over because the remaining testable quantities of the evidence were consumed or exhausted by defendant's testing.
[13] Despite several orders by the trial court which provided for money for the defense's DNA expert, due to a lack of funding for indigent defendants and confusion as to who was responsible to carry out the court's order at that time, the bill remained unpaid for several years.
[14] Defendant argues that based on this Court's ruling in State v. Langley, 639 So.2d 211 (La.1994), this case should be remanded for a full hearing on the matter. However, as the state notes in its brief, Langley concerned a motion to quash the indictment which was denied because the court held that as a white male Langley did not have standing to raise the issue. After the United States Supreme Court ruled in Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), that a white defendant has third-party standing to assert the equal protection rights of venire persons excluded on racial grounds, Id., 118 S.Ct. at 1424, Langley was remanded for a hearing on the motion to quash. In the instant case, defendant, who is black, was afforded a hearing on the matter.
[15] A review of State v. Young, supra, shows that at the hearing in that case the defense called Ms. Jones who similarly testified that information regarding race was not available. In addition, the defense admitted two exhibits. The first exhibit was a list of 29 names from the Jury Coordinator's files of forepersons who served on East Baton Rouge grand juries from 1978 to 1988. The parties stipulated that of the 29 people who served, there were two black females on the list. The defense also submitted a copy of the 1980 Census information and statistics covering East Baton Rouge Parish which showed that blacks made up 31.1 percent of the total populations. Based on this information, the motion to quash the indictment was denied. On appeal the First Circuit upheld that decision stating, "the defendant failed to show the percentage of minority persons in the general or grand jury venires, or the percentage of qualified minority persons in the general population, therefore, the trial judge was correct in finding that the defendant had not made the required prima facie case." Id., 569 So.2d at 576.
[16] We note that it was the state, not the defense, that sought to offer and file into evidence the record in State v. Young.
[17] For example, during the cross-examination of Ms. Horton, the defense attorney questioned her about statements she made to the police after the crime including: that Patrick Jenkins told her that he always watched her house; that she received an obscene phone call one night after accepting a ride home from Jenkins and believed that it either was made by Jenkins or the defendant; that Jenkins acted strangely since the night Delky was killed; that Jenkins asked her the night of the murder if the killer "cut" Delky. In addition, the defense called Detective Rick Temple who interviewed Kim Bates while investigating Delky Nelson's murder. Temple agreed that Bates, who considered herself to be friends with Jenkins, told him that she believed that Jenkins either knew something or was involved in the murder. He also agreed that Bates said that Jenkins would always question her and act nervously after she spoke with the police or public defender. Temple also relayed that Ms. Horton told him that she did not trust Jenkins and felt that he had been acting strangely since the time of Delky's murder.
[18] At the penalty phase the defense again argued that the polygraph results were admissible as evidence in mitigation. The court again ruled that the evidence was not admissible.
[19] Defendant claims that polygraph results are admissible at capital sentencing hearings. In support he cites Rupe v. Wood, 93 F.3d 1434 (9th Cir.1996), cert. denied, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997) and State v. Bartholomew, 101 Wash.2d 631, 683 P.2d 1079 (1984). Neither case addresses admission at a sentencing hearing of polygraph test results of a nontestifying capital defendant, the situation here. For example, in Rupe v. Wood, the Ninth Circuit granted habeas relief on several grounds, including that polygraph results of the state's star witness, claimed by the defense to be a full participant in the capital crimes, were excluded from defendant's sentencing hearing. Because the evidence went to a circumstance of the crime, i.e., relative culpability, the court held that it was admissible as mitigating evidence under Lockett v. Ohio, 438 U.S. 586, 605-606, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978), and that its exclusion mandated reversal. Rupe v. Wood, supra, 93 F.3d at 1439-1441. Similarly, in State v. Bartholomew, the state highest court held that polygraph exam results of a witness/accomplice were improperly excluded from defendant's sentencing hearing. 683 P.2d at 1088-1089.