h BROWN, J.
After the federal court set aside defendant’s first degree murder conviction, he was retried for second degree murder and convicted. He was thereafter sentenced to life imprisonment without benefit. This appeal is from that conviction. Finding no error, we affirm.

Facts

On June 19, 1993, defendant, James K. Williamson, entered the Soap Opera Was-hateria on Pines Road in Shreveport, Louisiana, and attempted to abduct Vickie Ferguson (now Perkins), his former girlfriend. Estal Thompson and his sons, Michael and Scott, intervened and all three were shot by defendant. Estal died at the scene while his sons, though seriously injured, survived.
Prior to the shooting, defendant had a long-term “on again, off again” relationship with Vickie Perkins which witnesses characterized as violent. Defendant and Vickie lived together for a number of years and had a daughter together. In May 1993, Vickie ended the relationship and moved out, taking the couple’s daughter with her. Vickie, who worked as a waitress at the Kettle, a diner, met and began a relationship with Scott Thompson. Scott, his brother Mike, and their father were from Toledo, Ohio, and were in Shreveport working on a welding project at a local business. Jerry Talbert was also in town working with the Thompsons.
The four men stayed at the Ramada Inn on Monkhouse Drive and ate most of their meals at the Kettle restaurant where Vickie was employed. In June, Vickie began staying at the motel with Scott. In early June, defendant | Jiad a confrontation with Scott at a local hotel lounge. The alterca *1238 tion ended when the bartender threatened to call the police.
On June 9,1993, Vickie filed a petition in juvenile court seeking a protective order against defendant and an award of sole custody of their daughter. Vickie was granted temporary custody and a temporary protective order was entered against defendant pending a hearing.
On June 15, 1993, a house owned by defendant’s sister burned. Defendant was living in the home, ownership of which was to be transferred to him so that he could get a second mortgage to finance an attempt to obtain legal custody of his child. Defendant contended that Vickie or the Thompsons were responsible for the fire.
On the morning of the fire, defendant was served with notice to appear in juvenile court that afternoon. At the hearing, defendant was granted a continuance to obtain counsel. The protective order and custody order were extended and the matter was set for hearing on June 29, 1993.
On June 19, 1993, the Thompsons, Jerry Talbert and Vickie Ferguson ate a late breakfast at the diner, then went to the washateria to do laundry. Vickie testified that defendant had called and threatened her several times while she was at the restaurant. Defendant, however, stated that Vickie called him and asked him to meet her at the laundromat so that he could see his daughter.
Defendant, armed with a .45 pistol, arrived at the washateria and confronted Vickie. She told the washateria attendant, Sandra Norwood, that he wasn’t supposed to be around her. Defendant grabbed Vickie by her hair |3and told her, “If you don’t go with me, I’m going to start shooting.” Ms. Norwood called 911 from a storage room.
Scott and Michael Thompson rushed at defendant in an attempt to get the gun away from him. Defendant began shooting, hitting Scott in his right eye, neck and shoulder and Michael in the chest. Estal Thompson went to his sons’ assistance and was shot twice in the center of his chest. Although seriously wounded, Scott and Michael survived; however, their father died within minutes of being shot.
Vickie broke away from defendant during his altercation with the Thompsons and ran to the storage room. Defendant found her there and dragged her out of the washateria by her hair at gunpoint. One of the patrons, Penny Campbell, was on the floor with her 6-year-old son. As defendant walked past her, he told her, “That’s right, you stay down.”
Defendant forced Vickie into his car and drove off with her. At first he acted happy to see her, but he then began slamming her head against the steering wheel and telling her that none of this would have happened if she had not “spread her legs.” Defendant held her head down as he drove. He had the pistol between his legs. Vickie was able to get the gun away from defendant and she threw the weapon out the car window. The gun was later recovered by police officers a short distance from the washateria and was determined to be the weapon that was used to kill Estal Thompson. Defendant laughed and told Vickie that it didn’t matter because he had another gun and they were going to die together.
^Defendant's car broke down several miles from the laundromat. Defendant pulled Vickie out of the car and they began walking down the road. He forced her down into a drainage ditch and began choking her. Several passing motorists, one of whom had a gun, attempted to help. The armed motorist pointed his gun at defendant and threatened to shoot him if he did not stop. Defendant told him, “go ahead, I’ve already shot three people to *1239 day.” However, defendant did stop and fled into the woods. He was arrested the next day.

Procedural History

Defendant was indicted by a grand jury for the first degree murder of Estal Thompson. Defendant was represented by attorneys from the Indigent Defenders’ Office. Prior to his trial in 1995, defendant filed a motion to dismiss his appointed counsel and sought to try the case himself. The trial court denied the motion and defendant’s trial was held March 13-24, 1995. The jury found defendant guilty of first degree murder and he was sentenced to life imprisonment without benefit. Defendant’s conviction was affirmed by this court. State v. Williamson, 27,871 (La.App.2d Cir.04/03/96), 671 So.2d 1208, writ denied, 96-1143 (La.10/04/96), 679 So.2d 1380.
Defendant thereafter sought habeas corpus relief with the U.S. District Court for the Western District of Louisiana, alleging that the trial court committed constitutional error in not allowing him to represent himself. The federal court agreed and vacated defendant’s conviction and sentence.
|RThe state amended the original indictment to charge defendant with second degree murder. Defendant pled not guilty to the amended charge. Following trial, defendant was found guilty as charged.

Discussion

Sufficiency of the Evidence

According to defendant, the evidence introduced at his second trial was insufficient to establish that he had the specific intent to kill or cause serious bodily harm to the victim, Estal Thompson.
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the fight most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. This court’s authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. Art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
[At the time of this offense, June 19, 1993, La.R.S. 14:30.1(A)(1) provided that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.[1]
In this case, the evidence shows that defendant was stalking his ex-girlfriend while armed. Defendant entered the was-hateria with the intent of taking his ex-girlfriend and made statements in front of several eyewitnesses about killing or seriously hurting anybody that interfered. Defendant then emptied his gun in the crowed laundromat, seriously wounding two men and killing another. He then took his former girlfriend with the stated purpose of killing her. When his car *1240 broke down, defendant drug her to a drainage ditch where he began to choke her. A passing motorist, who was armed, went to assist and was told by defendant of his intent to kill Vickie. Only when the passerby threatened to shoot defendant did he stop choking her and flee into the woods.
Defendant offered no evidence of an affirmative defense. Clearly defendant had the specific intent to kill or cause great bodily harm to Estal, Scott and Michael Thompson. The fact that defendant fired a large caliber pistol at another person at a very close range is evidence from which the jury could reasonably conclude that defendant had the specific intent to kill or cause great bodily harm to that person. See State v. Golson, 27,082 (La.App.2d Cir.06/21/95), 658 So.2d 225.
Pefendant argues that Estal Thompson’s death was an unintended consequence of his shooting at Estal’s two sons. He claims that he had no specific intent to kill or harm Estal Thompson. Even if this were so, this court has repeatedly applied the concept of transferred intent when a defendant shoots at one person with the specific intent to kill or cause great bodily harm, but hits and kills someone else. State v. Johnson, 29,629 (La.App.2d Cir.09/20/97), 698 So.2d 1051; State v. Jasper, 28,187 (La.App.2d Cir.06/26/96), 677 So.2d 553, writ denied, 96-1897 (La.02/21/97), 688 So.2d 521; State v. Cannon, 26,906 (La.App.2d Cir.06/21/95), 658 So.2d 728. If defendant shot at Scott and Michael Thompson with the intent to kill or cause great bodily harm and “unintentionally” shot and killed Estal Thompson, he is still guilty of second degree murder.

Grand Jury Foreperson Discrimination

Defendant, who is white, next argues that his indictment should have been quashed because of historic and systematic discrimination against African-Americans and women in the selection of grand jury forepersons in Caddo Parish.
Prior to its amendment in 1999, La. C.Cr.P. art. 412 provided, in pertinent part:
(A) The grand jury shall consist of twelve persons plus a first and second alternate for a total of fourteen persons qualified to serve as jurors, selected or drawn from the grand jury venire.
(B) In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury. The envelope | scontaining the remaining names shall be replaced into the grand jury box for use in filling vacancies as provided in Article 415.
Defendant’s challenge as to discrimination in the selection of grand jury forepersons is one of denial of equal protection. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). The appellate courts have developed a procedure for determining the denial of equal protection in the selection of grand jurors and grand jury forepersons. To demonstrate an equal protection violation in the context of grand jury selection, the defendant must establish a prima facie case of purposeful discrimination by showing that:
(1) Those alleged to be discriminated against belong to an identifiable group in the general population.
(2) The selection process is subject to abuse according to subjective criteria.
*1241 (3) The degree of under-representation, as shown by comparing the proportion of the group at issue found in the general population to the proportion called to serve.
See Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675; State v. Divers, 34,748 (La.App.2d Cir.06/22/01), 793 So.2d 308.
If the defendant meets the prima facie case, then the burden shifts to the state to rebut the prima facie ease by showing that permissible racially neutral selection criteria and procedures have produced the result. Castaneda, supra; State v. Cosey, supra; Rideau v. Whitley, 237 F.3d 472 (5th Cir.2000).
A review of the record shows that defendant failed to file into evidence any records or evidence establishing proof of his claim. Nor did |9he produce any witnesses to support his claim. The only witness called, the Caddo Parish District Attorney, was unable to testify to the race or sex of any of the past grand jurors and denied knowledge of any discrimination in the selection process. In light of the almost complete absence of evidence, we find that the trial court did not abuse its discretion in finding that defendant failed to establish his prima facie case of discrimination.

Denial of Various Defense Motions

Defendant argues that the trial court erred in not providing him with the funds to obtain a forensic pathologist and in not granting him a continuance to allow the pathologist time to review the pertinent records. He further asserts that this error denied him the right to effective assistance of counsel.
As noted by the supreme court in State v. Touchet, 93-2839 (La.09/06/94), 642 So.2d 1213, 1218:
[F]or an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution’s case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.
In this case, defendant filed a motion seeking funds for a forensic pathologist and for a continuance until the expert had time to review medical and autopsy records. Defendant contended that he needed the services of the pathologist for two reasons: to rebut the testimony of the hflCoroner from defendant’s first trial, which was that the two bullet wounds so close together in the center of the victim’s chest indicated aimed shots with an intent to kill or cause great bodily harm; and to determine the actual number of times that Scott Thompson, who had bullet wounds in his right eye, neck and right shoulder, had been shot. The state argued, and Scott testified, at the first trial that he had been hit with three .45 caliber bullets. Defendant, on the other hand, argued that Scott Thompson had been crouched over in an attack position and was hit with only one bullet which entered through his right eye, traveled downward through his neck and exited out his right shoulder.
When applying the standard set forth in State v. Touchet, supra, to defendant’s argument, in light of the evidence in this *1242 case, we find that defendant did not meet the burden required to show that the assistance of a forensic pathologist was needed to answer a substantial issue or to support a critical element of his defense, nor did the lack of his own forensic pathologist result in defendant having a fundamentally unfair trial. The eyewitness testimony clearly established that defendant went into the Soap Opera with the stated purpose of kidnaping his girlfriend and killing anyone who interfered. When the Thompson brothers sought to stop defendant, he began shooting at them with the admitted purpose of killing them.
As noted above, the repeated shooting of unarmed people in the head and chest at close range with a large caliber pistol is evidence to support a finding that defendant had the requisite specific intent to kill or cause great bodily harm to those people. Proving that Scott Thompson was shot only [ n once, instead of three times, does not change the fact that the jury had ample evidence to reasonably conclude that defendant had the specific intent to kill or cause great bodily harm to Scott and Mike Thompson when he began firing. Because defendant had specific intent to kill or cause great bodily harm when he began firing, proving whether Estal Thompson was subsequently hit twice accidentally or on purpose is not a substantial or critical issue that would have affected the jury’s subsequent verdict of second degree murder.
Further, Dr. McCormick did not testify at this trial. Rather, Dr. Steven Cogswell, a deputy coroner for Caddo Parish, testified. Dr. Cogswell offered no opinion on intent until cross-examined by defendant. In response to defendant’s question concerning intent, Dr. Cogswell stated:
Both shots again followed relatively the same trajectory. Both of them passed through the heart and the left lung. Absent them being totally wild shots occurring very fortuitously or unfortui-tously very close to the same pathway then they were most likely aimed shots in which case I would say, yes, aiming at a heart is most likely to cause death.
This is simply a question of common sense and scientific expertise. The record does not show that the trial court’s denial of defendant’s request for funding for a forensic pathologist in any way resulted in him receiving a fundamentally unfair trial. Because the trial court’s denial of the funds was appropriate, the denial of the continuance was also appropriate.

Defendant’s Testimony from First Trial

On appeal, defendant acknowledges that the transcript of his testimony during the guilt phase of his 1995 trial was properly admitted into evidence, but contends that the transcript of his testimony of the penalty |T ¡..phase should not have been allowed into evidence. His objection is that the testimony involved inflammatory evidence of other crimes and defendant’s problems with drugs and alcohol and was introduced to show that defendant was a bad person. We note, however, that this objection was not raised at trial. A new basis for an objection cannot be raised for the first time on appeal. La.C.Cr.P. art. 841(A); State v. Cressy, 440 So.2d 141 (La.1988); State v. O’Neal, 501 So.2d 920 (La.App. 2d Cir.1987), writ denied, 505 So.2d 1139 (La.1987).

Jury Selection Process

Defendant argues that the process of selecting the jury pool and the individual jury panels outside of his presence violated his right to be present during the selection of the jury.
After the first jury panel was called, defendant objected to the fact that the *1243 names had not been selected by lot from the general jury pool in his presence. As explained by the trial court, the random selection of members of the jury panels is done prior to the beginning of trial by the clerk and court reporter with the use of a computer program. Defendant urges that this violated La.C.Cr.P. arts. 409.3(E), 784 and 831.
La.C.Cr.P. art. 409.3(E) provides:
The petit jury shall be selected from the one or more central jury pool panels assigned to the court. Persons shall be called from the central jury pool panel at random.
La.C.Cr.P. art. 784 provides in part:
In selecting a panel, names shall be drawn from the petit jury venire indiscriminately and by lot in open court and in a manner to be determined by the court.
|13La.C.Cr.P. art. 831(A)(3) provides:
Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present ...
(3) At the calling, examination, challenging, impaneling and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror.
Defendant’s reliance on La. C.Cr.P. arts. 409.3, 784 and 831 for his assertion of an absolute right to be present when names of the prospective jurors are randomly picked is misplaced. A juror is not called or examined within the meaning of La.C.Cr.P. art. 831(A)(3) until he is called for examination in the trial of that particular defendant. State v. Meriwether, 412 So.2d 558 (La.1982). Nor is the right to be present at every aspect of jury selection an absolute right. As noted by the supreme court in State v. Hampton, 98-2605 (La.05/28/99), 737 So.2d 699, 700-701:
La.C.Cr.P. art. 831, subsection A(3) provides that a defendant charged with a felony shall be present at the calling, examination, challenging, empaneling and swearing of the jury and “at any subsequent proceedings for the discharge of the jury or juror.” See State v. White, 244 La. 585, 153 So.2d 401, 409 (1963) (“[0]nee a juror has been qualified as competent to serve and sworn— all in the presence of the defendant — he cannot thereafter be disqualified as incompetent to serve unless the defendant is present”) (footnote omitted); see also State v. Copeland, 419 So.2d 899, 905 (La.1982) (trial judge committed reversible error when he communicated with two jurors outside the presence of the defendant and his counsel “and determined that they were able to continue to serve on the jury without complying with La.C.Cr.P. art. 831(A)(3)’s mandate that defendant be present at such stage of the proceedings”). This rule is broader than the accused’s right under the Due Process Clause “to be present at a proceeding ‘whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence and to that extent only.’ ” United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-106, 108, 54 S.Ct. 330, 332, 333, 78 L.Ed. 674 (1934)). Nevertheless, the right conferred by La. C.Cr.P. art. 831(A)(3) is not absolute and may be tempered by exigent circumstances arising at trial. See State v. Spencer, 446 So.2d 1197, 1200 (La.1984).
In the instant case, defendant, without any evidence whatsoever, asserts that it is *1244 impossible to have random selection done by a computer. The record shows that, at the instruction of the trial court, the clerk of court used a computer program to randomly create a list of names for the jury pools to be called in defendant’s trial. There is no evidence in the record that the selection of these names was anything other than random. The names of the prospective jurors were called out in open court and in defendant’s presence. Defendant was provided with an opportunity to examine and challenge each one of the jurors. Defendant has made no showing that the manner in which the jury panels in his case were selected violated his due process rights, nor did he show that the selection of the panels has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge of second degree murder or that the selection process in any way thwarted his due process right to a fair and just hearing. See State v. Hampton, supra.

Conclusion

For the reasons set forth above, defendant’s conviction and sentence are AFFIRMED.

. Although not argued by the state, La.R.S. 14:30.1(A)(2) provides that second degree murder also includes a killing when the offender is engaged in certain crimes, including aggravated and second degree kidnapping, even though he has no intent to kill or cause great bodily harm.