NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-415

STATE OF LOUISIANA

VERSUS

NATHANIEL MITCHELL, III

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 19635-19
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

SHARON DARVILLE WILSON
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Sharon Darville Wilson, Judges.

AFFIRMED.

**Annette Roach**
**LOUISIANA APPELLATE PROJECT**
**P.O. Box 6547**
**Lake Charles, Louisiana  70606**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT**
    **Nathaniel Mitchell, III**

**Hon. Stephen C. Dwight, District Attorney**
**David S. Pipes, Assistant District Attorney**
**CALCASIEU PARISH DISTRICT ATTORNEY'S OFFICE**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana  70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE**
    **State of Louisiana**

**WILSON, Judge.**

A jury found Defendant, Nathaniel Mitchell, III, guilty of second-degree murder, in violation of La.R.S. 14:30.1. The trial court sentenced Mr. Mitchell to serve life in prison without benefit of probation, parole, or suspension of sentence. Mr. Mitchell now seeks review of his conviction. For the following reasons, we affirm the conviction and sentence, and Mr. Mitchell's ineffective assistance of counsel claim is relegated to post-conviction relief.

## I.

## ISSUES

We must decide:

(1)   whether the trial court erred in allowing the State to introduce various recordings into evidence when the recordings were not properly authenticated;

(2)   whether the trial court erred in allowing the State to place into evidence a gun cleaning kit found during a search of the home of Mr. Mitchell's ex-wife; and

(3)   whether counsel rendered assistance below that guaranteed by the Sixth Amendment, resulting in prejudice to Mr. Mitchell.

## II.

## FACTS AND PROCEDURAL HISTORY

Late afternoon on July 17, 2019, several teenagers found the burned body of a male at the dead end of D. Williams Road in DeQuincy, Louisiana. The teenagers notified law enforcement, and several days passed before police were able to identify the male from a DNA hit. The body was that of Zacchaeus Hakim Burton. On September 5, 2019, Mr. Mitchell was charged alongside George Anthony Buck with the second-degree murder of Mr. Burton, in violation of La.R.S. 14:30.1. On May 25, 2022, an amended indictment was filed, adding a charge against George

Buck for obstruction of justice, in violation of La.R.S. 14:130.1. On May 31, 2022, Mr. Buck entered into a plea deal with the State in exchange for testimony against Mr. Mitchell.

Trial began on September 27, 2022. On October 3, 2022, a jury found Mr. Mitchell guilty of second-degree murder, specifically finding that he killed Mr. Burton with a specific intent to kill or inflict great bodily harm. On November 7, 2022, Mr. Mitchell filed a motion for new trial contending his conviction was contrary to law and evidence. On November 22, 2022, a hearing was held on the motion, and it was denied by the trial court. On November 23, 2022, in accordance with La.R.S. 14:30.1(B), Mr. Mitchell was sentenced to life in prison without benefit of probation, parole, or suspension of sentence.

On December 6, 2022, Mr. Mitchell filed a motion for reconsideration of sentence alleging that his life sentence was excessive and cruel and unusual punishment. The motion was denied the same day without reasons. On September 6, 2023, the trial court held a resentencing hearing, at which time it specified that Mr. Mitchell's life sentence was to be served at hard labor and further clarified that any possible diminution of sentence would be at the discretion of the Department of Corrections. Mr. Mitchell now appeals.

III.

## LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

### VIDEO AUTHENTICATION

In his first assignment of error, Mr. Mitchell contends that the trial court erred in allowing the State to introduce various recordings into evidence when the recordings were not properly authenticated. A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Cosey*, 97-2020 (La. 11/28/00), 779 So.2d 675. Mr. Mitchell contends that the surveillance videos were not properly authenticated because the State did not establish that the various pieces of equipment were properly maintained and that the recordings' time stamps were accurate. Mr. Mitchell maintains that proper authentication required that the person whose equipment recorded the video be called as a witness to authenticate the evidence. We disagree.

Louisiana Code of Evidence Article 901 states, in pertinent part:

> **A. General provision**. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> **B. Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:

The article then goes on to list ten non-exclusive means of authenticating evidence including "**(B)(1) Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be[;]" "**(B)(4) Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances[;]" and "**(B)(9) Process or system.** Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

In the present case, various detectives testified to retrieving various surveillance recordings and provided firsthand accounts of the recovery of the

videos. Each officer described what was captured on the surveillance, how it was captured and how they determined the video's accuracy. As explicitly stated in La.Code Evid. art. 901(B)(1), testimony of a witness with knowledge that the evidence is what it is purported to be is sufficient to authenticate the evidence.

To support his argument, Mr. Mitchell relies heavily on the fourth circuit's decision in *State in Interest of J.H.*, 22-324 (La.App. 4 Cir. 8/9/22), 369 So.3d 827. In *J.H.*, the court held that the testimony from a detective regarding his familiarity with the area, location of cameras, and previous experience was insufficient to authenticate surveillance videos. Specifically, the court stated:

> Here, the State offered no testimony from a person who maintained the surveillance video system that recorded the video, to describe the process or system by which the video was created and to attest to the accuracy of the system. However, as argued by the State, Det. Bidichandani testified that he was familiar with the neighborhood of the Melpomene Housing Development, where the incident occurred; he knew to contact Mr. Pollard, the security director, about video surveillance; he retrieved the video footage from Mr. Pollard; and, from "previous experience collecting video footage from this area", he knew "that their camera systems and layout is accurate."
>
> We find Det. Bidichandani's testimony fails to lay the proper foundation for authentication of this video evidence. Det. Bidichandani received a copy of an excerpt of a video recording from a third party who did not testify regarding the process or system by which the video was created. Thus, there was no testimony regarding the accuracy of the video. In addition, since Det. Bidichandani received this from a non-testifying third party, the chain of custody has not been properly established. Consequently, the trial court abused its discretion in admitting the video surveillance footage into evidence.

*Id.* at 836.

Mr. Mitchell's reliance on *J.H.* is misplaced for three reasons. First, as recognized by Mr. Mitchell in his brief, the ultimate finding of the court in *J.H.* was that the evidence adduced at trial was insufficient to support the court's adjudication.

4

Therefore, the court's discussion of the admissibility of the surveillance tapes was nothing more than dicta. Secondly, *J.H.* is a case from the fourth circuit, so while it is persuasive, it has no direct authority to instruct this court on the application of La.Code Evid. art. 901. Finally, even the fourth circuit has distinguished *J.H.* and called the decision into question for failing to address La.Code Evid. art. 901(B)(1) and (4) as alternative means of authentication.

The fourth circuit recently addressed the *J.H.* ruling in *State in Interest of K.B.*, 23-409 (La.App. 4 Cir. 9/26/23), 372 So.3d 864. In *K.B.*, 372 So.3d at 881–83, the fourth circuit stated the following:

> However, we find the reasoning of *State in Interest of J.H.* distinguishable from the matter *sub judice*. First, as explained previously, the Court in *State in Interest of J.H.* concluded that the juvenile court abused its discretion because no one testified regarding the process or system by which the video was created. 2022-0324, p. 13, 369 So.3d at 836–37. Though La. C.E. art. 901(B)(9) lists "process or system" as a method of authenticating or identifying evidence, La. C.E. art. 901(B) specifically states that the list contained therein is "[b]y way of illustration only, and not by way of limitation" and that it constitutes a list of "examples of authentication or identification." Moreover, in other cases this Court has emphasized that La. C.E. art. 901(B) is not an "exhaustive" list. *See Smith*, 2015-1359, p. 6, 192 So.3d at 840. Thus, we find that citing to a party's failure to authenticate or identify evidence via one of the specific listed methods is an improper interpretation of La. C.E. art. 901(B).
>
> Second, in so holding, the Court in *State in Interest of J.H.*, also stated that the State had not properly established the chain of custody. 2022-0324, p. 13, 369 So.3d at 836–37. However, in discussing chain of custody, the Court in *State in Interest of J.H.* also specifically stated that "[t]he identification of the evidence *may* also be satisfied 'by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence.' " *Id.* at p. 11, 369 So.3d at 835 (emphasis added). Thus, like "process or system," the chain of custody is just another *potential* method for identifying or authenticating evidence. That is, the failure to authenticate or identify evidence in this matter does not

5

mean that the evidence has not been properly or sufficiently authenticated or identified; therefore, the failure to authenticate or identify evidence via one of these listed methods should not automatically be deemed fatal by a court.

Additionally, it is worth noting that although the Court in *State in Interest of J.H.* listed La. C.E. art. 901(B)(1) and (4) in one of its opening rule statements about authentication and identification of evidence, the Court did not appear to consider whether these examples of methods of authentication or identification were applicable in the matter (i.e., (1) testimony of witness with knowledge and (4) distinctive characteristics and the like). 2022-0324, p. 11, 369 So.3d at 835–36). Yet, the Court summarized the State's argument about the authentication or identification of the footage in this regard:

> Det[ective] Bidichandani testified that he was familiar with the neighborhood of the ... [h]ousing [d]evelopment, where the incident occurred; he knew to contact Mr. Pollard, the security director, about video surveillance; he retrieved the video footage from Mr. Pollard; and, from "previous experience collecting video footage from this area", he knew "that their camera systems and layout is accurate."

*Id.* at p. 13, 369 So.3d at 836. However, the Court did not discuss La. C.E. art. 901(B)(1) and (4) in its analysis or explain why Detective Bidichandani's testimony to this effect failed to satisfy La. C.E. art. 901(B)(1) and/or La. C.E. art. 901(B)(4).

Finally, the Court in *State in Interest of J.H.* appears to have relied in its reasoning on distinguishing its facts from the situation the Louisiana Supreme Court addressed in *State v. Rice*, 2017-0446 (La. 6/29/17), 222 So.3d 32.2022-0324, pp. 12-13, 369 So.3d at 835–36. In *Rice,* the district court concluded that the State had not sufficiently authenticated video surveillance footage and sustained an objection to the footage lodged by the prosecution. 2017-0446, pp. 1-2, 222 So.3d at 32-33. The Louisiana Supreme Court disagreed, explaining:

> [T]he defense called Shelby Williams, who lives across the street from defendant and whose video surveillance system captured defendant at, according to Mr. Williams's testimony, times pertinent to when the offenses occurred. ...

6

....

The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. La. C.E. art. 901(A). Such evidence may come in the form of testimony by a witness with knowledge that the matter is what it is asserted to be; indications of the item's distinctive characteristics, including its contents, substance, internal patterns, and other distinctive characteristics; or evidence describing the process or system used to produce the item and showing that the process or system produces an accurate result. See La.C.E. art. 901(B)(1), (4), and (9).

Such a showing was made by Mr. Williams's testimony. Contrary to the prosecutor's objection—urging that there was no custodian who could testify about the process by which the video was produced—Mr. Williams explained that he had personally designed and managed the video surveillance system at his home (for security purposes) and knew the video at issue to be what it was asserted to be. He also described the process and system by which the video was created and testified to the accuracy of that system

Id. at pp. 1-3, 222 So.3d at 33-34 (footnotes omitted).

After summarizing *Rice*, the Court in *State in Interest of J.H.* distinguished it by observing that "the State offered no testimony from a person who maintained the surveillance video system that recorded the video, to describe the process or system by which the video was created and to attest to the accuracy of the system." 2022-0324, p. 13, 2022 WL 3210100, at *6. However, as the above excerpt from *Rice* demonstrates, the Louisiana Supreme Court addressed the narrow issue of whether the footage *could* be authenticated by Mr. Williams in light of Mr. Williams' testimony that his video surveillance system had captured the defendant at times pertinent to when the offenses occurred, as well as Mr. Williams' testimony that he designed and managed the video surveillance system. 2017-0446, pp. 1-3, 222 So.3d at 33-34. Notably, the Louisiana Supreme Court did not say that this was the only way the footage could have been

7

authenticated or identified or that Mr. Williams was the only witness who could have authenticated or identified the footage. *Id.*

As discussed above, establishing a chain of custody of the video is a sufficient manner of authenticating a video, one of many ways to do so. Additionally, as noted by Mr. Mitchell in his brief, the objections raised at trial were to the contents of the video. Mr. Mitchell has put forth no evidence to question the chain of custody of the videos, as he acknowledges trial counsel did not object to the establishment of the chain of custody of the videos.

In light of La.Code Evid. art. 901 and the fourth circuit's ruling in *K.B.*, we cannot say the trial court committed manifest error when it allowed surveillance videos to be introduced when there was testimony establishing the chain of custody, which defense counsel conceded during trial and in brief to this court. As noted in *K.B.*, 372 So.3d at 881, "the failure to authenticate or identify evidence in this matter does not mean that the evidence has not been properly or sufficiently authenticated or identified; therefore, the failure to authenticate or identify evidence via one of these listed methods should not automatically be deemed fatal by a court." Accordingly, we find that the argument with regard to the introduction of surveillance video lacks merit.

Mr. Mitchell also contests the introduction of information obtained from two License Plate Readers (LPRs) in the town of DeQuincy which were used to corroborate codefendant George Buck's testimony regarding where he, Defendant, and the victim were travelling the day of the murder. Detective Travis Lavergne, the Senior Sergeant in the Calcasieu Parish Sheriff's Office's Violent Crime Unit, testified that the Calcasieu Parish Sheriff's Office has a Field Intelligence Group which ensures the accuracy and functionality of the LPRs located throughout the parish, consistently ensuring their accuracy. He did note, however,

8

that while there are two LPRs in DeQuincy which were important to the case, the location of one of the LPRs was incorrect in the field report. Specifically, he noted one of the LPRs was listed as being located at the intersection of Highway 12 West and Highway 109 when it was actually located on East 4th Street. Nonetheless, Detective Lavergne noted the GPS verified the actual location of the LPR and confirmed it was located on East 4th Street. Defense counsel raised no objection to the introduction of the LPR reports tracking the movement of the car Mr. Buck was driving and the vehicle Mr. Mitchell was driving. In light of Detective Lavergne's testimony and the failure of defense counsel to object to the introduction of the LPR reports, we find that this portion of Mr. Mitchell's assignment of error is also without merit.

## GUN KIT ADMISSIBILITY

In his second assignment of error, Mr. Mitchell contends the trial court erred in allowing the State to place into evidence a gun cleaning kit found during a search of the home of his ex-wife. Essentially, Mr. Mitchell asserts the admission of the gun cleaning kit, found in the home of his ex-wife Deanna Peters, was error because the State offered no evidence to connect the kit to him beyond testimony from Ms. Peters that the kit was not hers and that she did not have a gun in the home. Mr. Mitchell contends the gun cleaning kit was not relevant to the case; however, even if it was relevant, its probative value was so insignificant that it was greatly outweighed by the prejudice caused when the State insinuated to the jury that the kit was his, indicating that he had a gun when he was visiting Ms. Peters at the time the victim was killed. At the time the cleaning kit was introduced into evidence, the trial court stated to the jury:

> But I will state, with regard to relevancy, that it does seem to have some minimal contact. However, it does go to the total weight of the

9

allegations; and, therefore, you will be able to give it whatever weight you think is appropriate. Any or none is up to you as the triers of fact.

The State argues that, considering the relatively low bar for relevance under La.Code. Evid. art. 401, the lack of any intrinsic prejudice from association with a gun cleaning kit, and the cautionary instruction to the jury, the admission of the kit was not an abuse of discretion. Nonetheless, the State contends that even if the admission was an abuse of discretion, any error would be harmless given the other evidence presented to the jury.

During the trial, the jury heard testimony from George Buck as to the commission of the crime by Mr. Mitchell. That testimony was corroborated by phone records placing Mr. Mitchell with the victim, Mr. Burton, the entire day of his homicide, including at the time of his death. It was further corroborated by the testimony of Mr. Mitchell's ex-wife, who also placed Mr. Burton and Mr. Mitchell together and testified to their absence from her home the morning of the murder. Finally, it was also corroborated by video surveillance and other electronic data which tracked Mr. Buck's account of what happened.

According to Mr. Buck, Mr. Mitchell and Mr. Burton met Mr. Buck at his parents' house, then the three of them met at Mr. Buck's grandparents' house, at which time Mr. Mitchell told him Mr. Burton was buying a gun from someone. Mr. Buck testified he then met Mr. Mitchell and Mr. Burton at a gas station before meeting them again at his grandmother's house. According to Mr. Buck, at that time, Mr. Mitchell told him Mr. Burton was trying to kill him and he was going to do something to stop him. Despite knowing Mr. Mitchell was planning to kill Mr. Burton, Mr. Buck testified he led them to a secluded, dead-end road. That road was D. Williams Road, near Mr. Buck's grandmother's house. Mr. Buck testified he met Mr. Mitchell at D. Williams Road in his own car, they all went to the store, then Mr.

10

Buck got into the car with Mr. Mitchell and Mr. Burton at his grandmother's house, and the three of them returned to D. Williams Road with Defendant driving.

According to Mr. Buck, Mr. Mitchell asked him to get out of the car and grab a "little white box" out of the trunk. After not finding a little white box in the trunk, Mr. Buck saw Mr. Mitchell and Mr. Burton standing on the side of the car, at which point Mr. Mitchell shot Mr. Burton multiple times. Mr. Buck described the gun as a black and silver semi-automatic pistol. According to Mr. Buck, he removed Mr. Burton's money and ID from his body, then he and Mr. Mitchell returned to Mr. Buck's grandmother's house. Mr. Buck then took a gas can, returned to Mr. Burton's body, and set Mr. Burton's body on fire to try and destroy any DNA evidence that might have linked him to Mr. Burton's death.

The surveillance videos and LPRs discussed above corroborated Mr. Buck's story, confirming the vehicles were where he said they were, showing the three men all together at the gas station, then a single car returning to the area where Mr. Burton died. Additionally, cell phone records showed Defendant and Mr. Burton were together the night before the murder and the day of said murder. This court has previously noted that "even the erroneous admission of irrelevant evidence does not require a reversal of a conviction if the error is harmless beyond a reasonable doubt." *State v. Chesson*, 03-606, p. 18 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 179–80, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686. As also noted by this court in *Chesson,* 856 So.2d at 180:

> In *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993), the United States Supreme Court explained that:
>
>> Harmless-error review looks . . . to the basis on which "the jury *actually rested* its verdict." *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)(emphasis added). The inquiry, in

other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

Much like in *Chesson*, Mr. Mitchell's conviction in the instant case rested on the eye-witness testimony of codefendant George Buck, as corroborated by surveillance footage, GPS tracking of cell phones, and LPRs which noted the location of the vehicles being used by Mr. Mitchell and Mr. Buck on the day of the murder. While the gun cleaning kit may have been irrelevant, we find that there is no evidence to support any suggestion that the erroneous introduction into evidence of the gun cleaning kit had any prejudicial effect on Mr. Mitchell's trial. Accordingly, we find that this assignment of error lacks merit.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his final assignment of error, Mr. Mitchell contends that counsel rendered assistance below that guaranteed by the Sixth Amendment, resulting in his prejudice  Specifically, Mr. Mitchell contends trial counsel was ineffective for failing to request a "great caution" jury instruction, failing to object to the State's admission of irrelevant evidence concerning a trip to Baton Rouge after the murder, failing to object to the State's closing argument comments about the trip, and failing to  lodge a continuing objection to the introduction of evidence discussed in Assignment of Error number 1.

Issues involving ineffective assistance of counsel are typically relegated to post-conviction relief; however, "[w]hen 'the record discloses evidence needed to decide the issue,' an appellate court may decide it." *State v. Peart*, 621 So.2d 780, 787 (La.1993)(quoting *State v. Ratcliff*, 416 So.2d 528, 530 (La.1982))." Claims of ineffective assistance are evaluated under the two-prong test established

in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). That test requires a defendant to prove not only that his counsel's performance was deficient but also that the deficiency prejudiced the defense; both prongs must be met.

Regarding the "great caution" instruction, Mr. Mitchell puts forth the following:

> George Buck was a fourth felony offender, having just been released from prison less than two weeks before this crime. He gave four different versions of the event and entered into a favorable plea agreement shortly before his own trial was scheduled to start. Although this information was made known to the jury, the jury was not instructed properly regarding the great caution it should give to the co-defendant's testimony.

Mr. Mitchell contends the jury should have been instructed that they should accept the testimony of the codefendant "with great caution, suspicion, or distrust as the codefendant provided evidence in exchange for an advantage." As noted by the State, however, the trial court did give the following instruction to the jury:

> In evaluating the testimony of the witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she is testifying, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the Defendant, and the extent to which the testimony is supported or contradicted by other evidence.

This instruction is virtually identical to the instruction given by the trial court in *State v. Talbert*, 20-251 (La.App. 3 Cir. 2/3/21), 311 So.3d 1100. There, this court stated "the 'great caution' instruction is not required when the codefendant's testimony is corroborated by surrounding circumstances." *Id.* at 1113. Apparently recognizing this flaw in his argument, Mr. Mitchell contends his case is distinguishable from *Talbert* because no one placed him in possession of a handgun before or after the shooting and there was no physical evidence linking him to the crime scene. Although Mr. Mitchell contends the evidence regarding the

13

"surrounding circumstances" is unreliable, his complaints are all issues which were known to the jury, such as the "large margin of error" regarding the cell-phone analysis.

While the *Talbert* case did involve a separate witness testifying they saw the defendant with a gun, aside from the testimony of the codefendant who placed multiple guns in the hands of the defendant, the primary issue involved in the *Talbert* case was the issue of misidentification, raised by the defendant. Mr. Mitchell in the instant case has not claimed misidentification; rather, he argued Mr. Buck was lying and there is no evidence, aside from Mr. Buck's testimony, to indicate he was involved in this shooting in any way. Indeed, Mr. Mitchell contends "the evidence offered more support to find that Buck was involved in selling an illegal gun to Burton, and the shooting occurred during that transaction."

Based upon the evidence presented at trial, which corroborated Mr. Buck's testimony regarding the movements of himself, Mr. Mitchell, and the victim on the day the victim was murdered, we find that, like in *Talbert*, the instruction given to the jury was sufficient to remind the jury of its duty to consider the motivations Mr. Buck had in testifying and the "great caution" instruction was not required. Accordingly, Mr. Mitchell cannot establish counsel's failure to request the "great caution" instruction would have resulted in a different outcome; and, therefore, he cannot establish counsel's actions prejudiced him as required under *Strickland*.

Additionally, as already stated, there was no error in the trial court's admission of evidence discussed in Mr. Mitchell's first assignment of error, and Mr. Mitchell cannot establish counsel's actions prejudiced him as required under *Strickland*.

14

With regard to the final portion of this assignment of error, that trial counsel should have objected to the State eliciting testimony from Mr. Buck regarding a trip he and Mr. Mitchell took to Baton Rouge two days after Mr. Burton's murder, we find this issue should be relegated to post-conviction relief. The State contends this was a strategic decision by Mr. Mitchell's trial counsel to attack Mr. Buck's claim that he and Mr. Mitchell's relationship ended after Mr. Mitchell involved him in a murder. During the trial, Mr. Mitchell's counsel pointed out the fact Mr. Mitchell helped Mr. Buck assemble furniture for Mr. Buck's children at his home and travelled with Mr. Mitchell to Baton Rouge two days later. We find that the evidence before this court is insufficient to determine whether trial counsel intentionally allowed the evidence in strategically, or if his failure to object was deficient performance. Accordingly, we find this issue should be relegated to post-conviction relief, where the trial court may develop a full record on the issue.

IV.

## CONCLUSION

For the foregoing reasons, Mr. Mitchell's conviction and sentence is affirmed; however, his claim for ineffective assistance of counsel, regarding counsel's failure to object to the State's introduction of evidence concerning a trip to Baton Rouge two days after the shooting, is relegated to post-conviction relief.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.